(INND Rev. 1/21)

# 3027474

page 1

FILED
2021 AUG 18 PM 12: 2
U.S. DISTRICT COURT CLE
NORTHERN DISTRICT
OF INDIANA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

*[This form is for non-prisoners to file a civil complaint. __NEATLY__ print in ink (or type) your answers.]*

Jennifer J. Reinoehl
_____

*[You are the **PLAINTIFF**, print your full name on this line.]*

v.

Centers for Disease Control and Prevention
_____

*[The **DEFENDANT** is who you are suing. Put __ONE__ name on this line. List __ALL__ defendants below, including this one.]*

Case Number    3:21CV608

*[For a new case in this court, leave blank. The court will assign a case number.]*

*[The top of this page is the caption. Everything you file in this case must have the same caption. Once you know your case number, it is __VERY IMPORTANT__ that you include it on __everything__ you send to the court for this case. __DO NOT__ send more than one copy of anything to the court.]*

# CIVIL COMPLAINT

| # | Defendant's Name and Job Title | Address |
|---|---|---|
| 1 | *[Put the defendant named in the caption in this box.]* <br><br> (see attachment) | |
| 2 | *[Put the names of any other defendants in these boxes.]* | |
| 3 | | |

*[If you are suing more defendants, attach an additional page. Number each defendant. Put the name, job title, and address of each defendant __in a separate box__ as shown here.]*

1. How many defendants are you suing? ___16___

2. What is your address? 51860 Cheryl Dr., Granger, IN, 46530

3. What is your telephone number: (574) 259-3085

4. Have you ever sued anyone for these exact same claims?
   - ☑ No.
   - ◯ Yes, attached is a copy of the final judgment __OR__ an additional sheet listing the court, case number, file date, judgment date, and result of the previous case(s).

*[__DO NOT__ write in the margins or on the back of any pages. Attach additional pages if necessary.]*

| # | Defendant's Name and Job Title | Address |
|---|---|---|
| 1 | Centers for Disease Control and Prevention | 1600 Clifton Road, Atlanta, GA, 30329 |
| 2 | Dr. Anthony S. Fauci, director of the National Institute of Allergy and Infectious Diseases | 31 Center Drive MSC 2520, Building 31, Room 7A03, Bethesda, MD 20892-2520 |
| 3 | Food and Drug Administration | 10903 New Hampshire Avenue, Silver Spring, MD, 20993 |
| 4 | Governor Eric J. Holcomb, Governor of Indiana | 4750 North Meridian Street, Indianapolis, Indiana, 46208-3540 |
| 5 | Dr. Kristina M. Box, Indiana State Health Commissioner | 2 North Meridian Street, Indianapolis, IN, 46204 |
| 6 | St. Joseph County Health Department | 227 W. Jefferson Boulevard, #825, South Bend, IN, 46601. |
| 7 | St. Joseph County Council | 227 W. Jefferson Boulevard, #411, South Bend, IN, 46601 |
| 8 | Elkhart County Health Department | 608 Oakland Ave, Elkhart, IN, 46516 |
| 9 | Elkhart County Council | 117 North Second Street, Goshen, IN, 46526 |
| 10 | Marion City-County Council | 200 East Washington Street, T241, Indianapolis, IN, 46204 |
| 11 | Marion County Health Department | 3838 N Rural St, Indianapolis IN 46205 |
| 12 | Beacon Medical Group | 615 N. Michigan Street, South Bend, IN, 46601 |
| 13 | AMC Theaters | 11500 Ash St., Leawood, KS, 66211 |
| 14 | Menard, Inc. | 5101 Menard Dr., Eau Claire, WI, 54703 |
| 15 | Krispy Kreme Doughnut Corporation | 370 Knollwood, Winston-Salem, NC, 27103 |
| 16 | Sephora | 525 Market St., Fl 32, San Francisco, CA 94105 |

(INND Rev. 1/21)                                                                                          page 2

# CLAIMS and FACTS

DO: Write a short and plain statement telling what each defendant did wrong.

DO: Use simple English words and sentences.

**DO NOT**: Quote from cases or statutes, use legal terms, or make legal arguments.

DO: Explain when, where, why, and how these events happened.

DO: Include every fact necessary to explain your case and describe your injuries or damages.

DO: Number any documents you attach and refer to them by number in your complaint.

**DO NOT**: Include the names of minors, social security numbers, or dates of birth.

DO: Use each defendant's name every time you refer to that defendant.

DO: Number your paragraphs. [*The first paragraph has been numbered for you.*]

1. (see attachment)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

*[DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.]*

(INND Rev. 1/21)                                                                                   page 3

**Claims and Facts (continued)**

_____

_____

_____

_____

_____

_____

_____

## PRIOR LAWSUITS – Have you ever sued anyone for this exact same event?

- ☑ No.
- ◯ Yes, attached is a copy of the final judgment **OR** an additional sheet listing the court, case number, file date, judgment date, and result of the previous case(s).

## RELIEF – If you win this case, what do you want the court to order the defendant to do?
(see attachment) _____

_____

_____

_____

_____

## FILING FEE – Are you paying the filing fee?

- ☑ Yes, I am paying the $402.00 filing fee. I understand that I am responsible to notify the defendant about this case as required by Federal Rule of Civil Procedure 4. [*If you want the clerk to sign and seal a summons, you need to prepare the summons and submit it to the clerk.*]

- ◯ No, I am filing a Motion to Proceed In Forma Pauperis and asking the court to notify the defendant about this case.

[*Initial Each Statement*]

___ I will keep a copy of this complaint for my records.

___ I will promptly notify the court of any change of address.

___ I declare **under penalty of perjury** that the statements in this complaint are true.

_____          August 18, 2021
Signature                                   Date

[*DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| **JENNIFER REINOEHL,** | ) | |
| PLAINTIFF | ) | |
| **v.** | ) | **Cause No.** _____ |
| | | |
| **CENTERS FOR DISEASE CONTROL AND** | ) | |
| **PREVENTION** | ) | |
| | | |
| **DR. ANTHONY S. FAUCI** | ) | |
| **(in his individual and official capacity),** | ) | |
| | | |
| **FOOD AND DRUG ADMINISTRATION** | ) | |
| | | |
| **GOVERNOR ERIC J. HOLCOMB** | ) | |
| **(in his individual and official capacity),** | ) | |
| | | |
| **DR. KRISTINA M. BOX** | ) | **JURY TRIAL DEMANDED** |
| **(in his individual and official capacity),** | ) | |
| | | |
| **MARION CITY-COUNTY COUNCIL,** | ) | |
| | | |
| **MARION COUNTY HEALTH DEPARTMENT,** | ) | |
| | | |
| **ST. JOSEPH COUNTY HEALTH DEPARTMENT,** | ) | |
| | | |
| **ST. JOSEPH COUNTY COUNCIL,** | ) | |
| | | |
| **ELKHART COUNTY HEALTH DEPARTMENT,** | ) | |
| | | |
| **ELKHART COUNTY COUNCIL,** | ) | |
| | | |
| **BEACON MEDICAL GROUP,** | ) | |
| | | |
| **AMC THEATERS,** | ) | |
| | | |
| **MENARD, INC.,** | ) | |
| | | |
| **KRISPY KREME DOUGHNUT CORPORATION,** | ) | |
| | | |
| **and SEPHORA** | ) | |
| DEFENDANTS | ) | |

## VERIFIED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Now comes JENNIFER J. REINOEHL (herein referred to as the "Plaintiff"), on behalf of

herself, pro se, and respectfully brings this Complaint for Damages and Declaratory Relief,

against Defendants: Centers for Disease Control and Prevention (herein "CDC"), Dr. Anthony S.

Fauci in his individual and official capacity, Food and Drug Administration (herein "FDA"),

Governor Eric J. Holcomb in his individual and official capacity, Dr. Kristina M. Box in her

individual and official capacity, Marion City-County Council, Marion County Health

Department, St. Joseph County Health Department, St. Joseph County Council, Elkhart County

Health Department, Elkhart County Council, Beacon Medical Group (herein "Beacon"), Menard,

Inc., Sephora, Krispy Kreme Doughnut Corporation (herein "Krispy Kreme"), and AMC

Theaters (collectively herein referred to as the "Defendants").

# I.    PARTIES TO THE COMPLAINT

**A. The Plaintiff**

1.      Jennifer J. Reinoehl resides at 51860 Cheryl Dr., Granger, St. Joseph County, IN, 46530

with phone number: 574-302-6088.

**B. The Defendants**

2.      The Centers for Disease Control and Prevention is part of the U.S. Public Health Service

of the Department of Health and Human Services headquartered at 1600 Clifton Road, Atlanta,

GA, 30329.

3.      Dr. Anthony S. Fauci is the director of the National Institute of Allergy and Infectious

Diseases a part of the National Institutes of Health, which is located at 31 Center Drive MSC

2520, Building 31, Room 7A03, Bethesda, MD 20892-2520 and is being sued in his official and

individual capacity.

2

4.      The Food and Drug Administration is part of the U.S. Public Health Service of the Department of Health and Human Services headquartered at 10903 New Hampshire Avenue, Silver Spring, MD, 20993.

5.      Governor Eric J. Holcomb is the acting governor of the State of Indiana and resides at 4750 North Meridian Street, Indianapolis, Indiana, 46208-3540 and is being sued in his official and individual capacity.

6.      Dr. Kristina M. Box is the Indiana State Health Commissioner is the secretary and executive officer of the Indiana Department of Health and Human Services (herein referred to as "IDHHS"), which is headquartered at 2 North Meridian Street, Indianapolis, IN, 46204.

7.      The St. Joseph County Health Department is a county health department headquartered at 227 W. Jefferson Boulevard, #825, South Bend, IN, 46601.

8.      The St. Joseph County Council is the governing body of St. Joseph County, Indiana and meets at 227 W. Jefferson Boulevard, #411, South Bend, IN, 46601.

9.      The Elkhart County Health Department is a county health department headquartered at 608 Oakland Ave, Elkhart, IN, 46516.

10.     The Elkhart County Council is the governing body of Elkhart County, Indiana and meets at 117 North Second Street, Goshen, IN, 46526.

11.     The Marion City-County Council is the governing body of the City of Indianapolis and Marion County, Indiana headquartered at 200 East Washington Street, T241, Indianapolis, IN, 46204.

12.     The Marion County Health Department is a county health department headquartered at 6042 East Twenty-first Street, Indianapolis, IN 46219.

3

13.     Beacon Medical Group is a health network with administrative offices at 615 N. Michigan Street, South Bend, IN, 46601, that provides northern Indiana with wellness services whose publicly listed registered agent is Jeffrey P. Costello with an Indiana service address at 615 N. Michigan Street, South Bend, IN, 46601.

14.     AMC Theaters is an entertainment venue with corporate headquarters located at 11500 Ash St., Leawood, KS, 66211, whose publicly listed registered agent is Corporate Creations Network with an Indiana service address of 8520 Allison Pointe Boulevard, #220, Indianapolis, IN, 46250.

15.     Menard, Inc. is a home improvement retailer with corporate headquarters at 5101 Menard Dr., Eau Claire, WI, 54703, whose publicly listed registered agent is The Prentice-Hall Corporation System, Inc. with an Indiana service address of 135 North Pennsylvania Street, Suite 1610, Indianapolis, IN, 46204.

16.     Krispy Kreme Doughnut Corporation is a doughnut restaurant with corporate headquarters located at 370 Knollwood, Winston-Salem, NC, 27103, whose publicly listed registered agent is Corporation Service Company with an Indiana service address of 135 North Pennsylvania Street, Suite 1610 Indianapolis, IN, 46204.

17.     Sephora is a personal care and beauty product retailer with its North American corporate headquarters located at 525 Market St., Fl 32, San Francisco, CA 94105, whose publicly listed registered agent is Corporation Service Company with an Indiana service address of 135 North Pennsylvania Street, Suite 1610, Indianapolis, IN, 46204.

## II.    BASIS FOR JURISDICTION AND VENUE

18.     The U.S. District Court for the Northern District of Indiana has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides Federal Courts have jurisdiction

4

over cases involving a federal question—U.S. Constitutional Rights granted under the 1st, 4th, 5th, and 14th Amendments and Rights bestowed by the Federal American Disabilities Act are in question.

19.     Title 42§ 1983, the U.S. Constitution, 14th Amendment §5, and *Ex parte Young*, 209 U.S. 123 (1908), allow lawsuits to be brought against persons in Federal and State government employ when those officials act under the color of law but act independent of Federal and State Laws. Dr. Anthony S. Fauci, Governor Eric J. Holcomb, and Dr. Kristina M. Box are granted lawful authority to make recommendations and enact orders during public emergencies, but they have abused Federal Laws through the orders they enacted and recommendations they have made as well as trampling on Constitutional Rights and discriminating against the disabled. Further, 5 U.S. Code § 702 allows persons who have suffered a legal wrong because of agency action to bring the matter for judicial review. In addition, the Indiana Constitution gives people the power to reform their government when it states in its Bill of Rights Article 1 § 1:

> "WE DECLARE, That all men are created equal…the PEOPLE have, at all times, an indefeasible right to alter and reform their government."

This confers a right of the citizens of Indiana to use the Federal Court to reform the state's government.

20.     The court has personal jurisdiction over Defendants because the CDC, Dr. Anthony S. Fauci, and the FDA are U.S. government agents or agencies.  The remaining Defendants are all situated in Indiana or do business in Indiana. Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council and Marion County Health Department are situated in Indianapolis; the St. Joseph County Health Department and St. Joseph County Council are situated in South Bend, IN; the Elkhart County Health Department and Elkhart County Council are situated in Elkhart, IN; Beacon and Menard, Inc, do business in South Bend, IN, Mishawaka,

5

IN, and Elkhart, IN among other places, Sephora does business in Mishawaka, IN and Elkhart, IN among other places, Krispy Kreme does business in Mishawaka, IN among other places, and AMC Theaters does business in South Bend, IN and in Elkhart, IN among other places.

21.      Venue is proper because most of the events and omissions giving rise to the allegations in this complaint occurred in St. Joseph County, IN, where (2) of the Defendants are situated and (5) of the Defendants are doing business, and in Elkhart County, IN, where (2) of the Defendants are situated and (5) are doing business (28 U.S. Code § 1391).

## III.   <u>STATEMENTS OF FACTS</u>

22.      Plaintiff resides in the unincorporated community of Granger, St. Joseph County, IN. Plaintiff, like the rest of the citizens of this jurisdiction, has been adversely affected by COVID-19.

23.      The unincorporated community of Granger is located across two Indiana counties: St. Joseph and Elkhart, making shopping areas in both counties convenient to its residents.

### A. Historical Scientific Background

24.      Prior to the acceptance of Germ Theory—the modern theory of disease transmission—Miasma Theory was the accepted theory of disease transmission. (Exhibit 1)

25.      Miasma Theory was the belief that "bad air," specifically bad smelling air, caused disease. Miasma Theory adherents believed that the smell of rotting fish or the smell of an unbathed person would cause smallpox or other diseases. Most of their methods of preventing disease transmission focused on avoiding bad smells. (Exhibit 1)

26.      The 1600's plague mask with its long "beak" was designed with Miasma Theory in mind—the "beak" was actually a potpourri holder to keep bad smells from reaching the nose. At the same time, the overall look of a plague doctor's outfit resembled that of a raven, a creature

which has powerful protective mythological ties for the British. These ties are so strong that today at least seven ravens are permanently kept with clipped wings on the Tower of London grounds allegedly for superstitious reasons.

27.     The plague mask's design bridged the fine line between medieval mysticism and science.

28.     By the 19th century, masks for public use that protected against Miasma had been patented, including but not limited to Lewis Haslett's 1849 "Lung Protector," which used charcoal to purify bad smells.

29.     Germ Theory, first proposed in A.D. 1546, started to gain scientific momentum against Miasma Theory by the late 19th and early 20th century. (Exhibit 1)

30.     So strong was the hold of the Miasma Theory, cloth masks were introduced to surgical attire around the 1880s when the scientific works of Pasteur, Lister, and Koch strengthened Germ Theory, and their antiseptic methods and procedures reduced deaths from infection after surgery.

31.     If the now disproven Miasma Theory had been correct, face masks would have prevented "bad air" from getting to the patient or the doctor.

32.     Adding cloth face masks did not improve surgical outcomes over Lister's methods—this competing method was called aseptic surgery. When aseptic surgery was challenged at the time for not reducing deaths any better than antiseptic surgery, the challenge was answered by saying surgeons were wearing the new items, including but not limited to masks, improperly or putting them on incorrectly instead of with direct evidence from randomized controlled trials.

33.     No research was performed in regards to the safety or effectiveness of cloth masks prior to their addition to the surgical attire.

7

34.     Once Germ Theory was widely accepted, face masks were justified as being able to block

bacteria from the surgeon's mouth. As this theory has been challenged, disposable surgical

masks were invented and have been defended as being able to prevent surgical splatters from

entering the surgeon's mouth or nose.

35.     In the more than 100 years since the introduction of cloth surgical masks, research

performed in real life situations has shown the ability of cloth masks and masks used by the

general public to control disease transmission is scientifically ineffective.

36.     In 1910 and 1911, pneumonic plague swept across Manchuria. Extensive experiments

were performed during that time on this droplet spread disease.

37.     In the *Report of the International Plague Conference* held at Mukden, April, 1911,

scientists placed agar plates in close proximity to a plague patient's mouth as well as holding

guinea pigs there, which are susceptible to the plague, and concluded,

> "During normal and dyspnoeic respiration of primary pneumonic-
> plague cases, plague bacilli are *not usually expelled by means of
> the expired air*. During coughing of such cases, even when sputum
> visible to the naked eye *is not expelled*, plague bacilli in large
> numbers may become widely disseminated into the air surrounding
> the patient…The idea that infection of doctors, nurses, attendants,
> etc., in plague hospitals, is caused entirely by particles of sputum
> expectorated by the patient and visible to the naked eye, is
> *erroneous*." [emphasis added]

In other words: During normal and labored breathing of people who have gotten pneumonic

plague through the air and not from a flea bite, the rod-shaped plague bacteria are *not usually

expelled through air they exhale*. During coughing, even when saliva and mucus visible to the

naked eye *does not come out* of the infected person's mouth, rod-shaped plague bacteria in large

numbers may become widely dispersed into the air surrounding the patient…The idea that

doctors, nurses, attendants, etc., in plague hospitals become infected with plague entirely by

8

particles of saliva and mucus coughed up by the sick patient and visible to the naked eye, is

*incorrect*. [emphasis placed on passages corresponding to the ones emphasized in the quote]

38.     The scientists conducting the experiments in ¶37 recommended tight fitting cloth masks

that were more than ½ inch thick to stop the particles that could not be seen. (Exhibit 2)

39.     Only 1 out of 20 doctors who wore this mask at Fuchiatien died. However, about 1 out of

5 nursing assistants (referred to as "Coolies" in Exhibit 3), who were also responsible for burying

the dead, died in Fuchiatien even though they were also wearing masks. More than 1 out of 3

"ambulance parties" (drivers and attendants) died in Fuchiatien despite wearing masks. High

death rates among lower medical staff at Fuchiatien were attributed to wearing the mask

improperly or inconsistently. (Exhibit 3) For comparison, about 1 in 10 people died in previous

plagues where masks were not used.

40.     In Vol. VII, Sec. B, No. 3, of the *Philippine Journal of Science* (June, 1912), Barber and

Teague, had lab assistants hold a solution containing *Bacillus prodigiosus* (*Serratia marcescens*),

a bacteria believed prior to the 1950s to be harmless to humans, in their mouths and then blow it

out through cloth masks (identical to the ones used in the Manchurian plague and recommended

for use in ¶38) to simulate sneezing and coughing, directing the airflow at Petri dishes. Although

the masks effectively stopped visible liquid droplets, *Bacillus prodigiosus* (*Serratia marcescens*)

were found on the petri dishes. This experiment proved cloth masks can stop visible droplets

without stopping bacteria. (Exhibit 3)

41.     *Serratia marcescens*, the bacteria used in the experiment in ¶40, is 500-800 x 900-2000

nanometers (μm) in size. SARS-CoV-2, the virus that causes COVID-19 is 60-140

nanometers(μm) in diameter. 168 of the largest SARS-CoV-2 viruses could fit inside the

smallest *Serratia marcescens*, which easily got through thick cloth masks.

42.     In summary: direct evidence from experiments cited in ¶37 and ¶40 showed that patients with diseases that are classified primarily as "droplet" spread diseases do not exhale a significant amount of bacteria (or viruses). It is only when they cough that these bacteria or viruses are spewed out of the body in large numbers, but they are primarily spewed out in a manner that is not visible to the naked human eye.

43.     All the "scientific" photographs created showing visible droplets coming out of human mouths are ignoring the real problem—which cannot be seen by the naked human eye.

44.     The term "droplet spread disease" is a misnomer, which for centuries has simply meant a disease that you get by close contact with a person (3-10 inches away from them) or by being in the pathway of their cough (10 feet away from them).

45.     The experiment summarized in ¶40 was one of several experiments performed by Barber, Strong, and Teague that made the other scientists at the convention realize cloth face masks were ineffective at stopping disease transmission. (Exhibit 3)

46.     From 1915 to 1920, G.H. Weaver published a several papers defending the use of cloth masks. Weaver's studies do not involve randomized controlled trials. In *Value of the Face Mask and Other Measures*, Weaver accredited masks of 2 layers of cloth with reducing infection in Durand Hospital. His study was poorly designed, and at the time the nurses wore the masks they had been previously exposed to the virus and therefore had some immunity to it.

47.     In the later published, *Droplet Infection and Its Prevention by the Face Mask*, Weaver re-examined his statements, after others had questioned his conclusions, and performed an experiment that showed it took at least 6 layers of tightly woven cloth to stop a sufficient amount of bacteria. He then recommended cloth masks be made from 3 layers of the same material even

though he knew this number of layers would not stop a sufficient amount of bacteria from penetrating it. (Exhibit 4)

48.     Kellogg questioned Weaver's findings on cloth masks after San Francisco mandated masks during the Spanish Flu without any effect on stopping disease transmission, so he performed a mechanical experiment where he used a machine to blow bacteria through different layers of cloth. He found it took (10) layers of cloth (noting this would cause breathing difficulties) in order to significantly stop the bacteria. (Exhibit 5) This is consistent with Barber and Teague's findings in ¶40 that fabric more than ½ inch thick was not sufficient to stop bacteria.

49.     All viruses are much smaller than bacteria.

50.     Major Capp, relying on Weaver's data (Kellogg's was not yet published), published *Measures for the Prevention and Control of Respiratory Infections in Military Camps*, August 10, 1918. In it, the measures he promoted after instituting them at Camp Grant included but were not limited to

> "every patient [upon arrival to the infirmary] with a contagious disease is masked immediately after the diagnosis is made."

These measures, he said, were

> "efficient in 95 per cent. [sic] of the exposures to scarlet fever and 100 per cent. [sic] of the exposures to the measles. If this experience can be taken as criterion, we soon shall be justified in ignoring the quarantine of the ward in these cross-infections, provided the system of masking and the cubicle is in good working order at the time of their appearance."

(Exhibit 6)

51.     The Spanish Flu arrived at Camp Grant September 21, 1918, six weeks after the paper discussing Major Capp's measures was published, and saw 70 hospital admissions that day. Eight days later, September 29, 1918, there were 788 admissions. In the end, Camp Grant had

11

10,713 cases of Spanish Influenza (about ¼ the population) and 1,060 deaths. Colonel Charles B.

Hagadorn shot himself because so many of his men died. These deaths occurred in a matter of

weeks—not months or years—despite strict masking requirements. (Exhibit 7)

52.     In 1919, the Navy published the results of the extensive research they conducted during

the Spanish Flu on preventing disease transmission, including a randomized controlled trial of

masks, the Secretary of the Navy stated in pertinent part,

> "First and last, all preventative measures which seemed logical,
> either from *a priori* reasoning or because of seemingly good
> effects claimed elsewhere during the year or previous epidemics,
> were tried in the Navy. These included quarantine, daily inspection
> of personnel and the taking of temperatures, early isolation of the
> sick, the wearing of face masks and gowns and rigid aseptic
> technic [sic] by attendants upon the sick...Not infrequently certain
> specific measures which were credited at one station with having
> prevented the spread of influenza or with having reduced the
> complications or with having kept case-fatality rates low failed to
> prove of any value at another station...In other words, each
> particular preventative measure failed in some instances to
> accomplish recognizable results."

> "The experience of 1918 would indicate that a very important
> preventative measure when confronted with an outbreak of
> influenza consists in rapidly enlarging existing medical and
> nursing facilities for the proper care and treatment of large
> numbers of persons who will inevitably be attacked regardless of
> the measures planned to prevent the occurrence or spread of the
> disease."

And

> "No evidence was presented which would justify compelling
> persons at large to wear masks during an epidemic. The mask is
> designed to only afford protection against a direct spray from the
> mouth of the carrier of pathogenic microorganisms; and assuming
> that it affords such protection, the probability that the
> microorganisms will eventually be carried into the mouth or nose
> by the fingers is very great if the mask is worn for more than a
> brief period of time. Masks of improper design, made of wide-
> mesh gauze, which rest against the mouth and nose, become wet
> with saliva, soiled with the fingers, and are changed infrequently,
> may lead to infection rather than prevent it especially when worn

> by persons who have not even a rudimentary knowledge of the modes of transmission of the causative agents of communicable diseases."

And finally,

> "At the United States Naval Training Station, Great Lakes, Ill., of 674 hospital corpsmen and volunteers of other ratings who were on duty caring for the sick during the epidemic, 96 wore gauze masks. The others did not. Of the latter, 7.9 per cent [sic] developed influenza, while 8.3 per cent [sic] of those who wore masks contracted the disease. It will be noted that the attack rate in both groups was much lower than for the personnel in general at the station." (Exhibit 8)

53.     In regards to real world use in a non-military setting, the city of Edmonton, Alberta,

Canada, enacted severe measures as soon as they got their first Spanish Flu case. Masks were

mandated 14 days after the first outbreak and initially met with high compliance. After the

pandemic passed, Dr. T. H. Whitelaw, who was the Medical Officer of Health for Edmonton,

published a scathing rebuke of the health measures in the Canadian Medical Association Journal

specifically stating about masks,

> "Had this mask order been instituted a few days before the epidemic reached its peak, it would probably have been acclaimed as the chief factor in bringing about the rapid subsidence of the epidemic, but unfortunately for the extravagant claims made in justification of the mask order as means of prevention, the number of cases of the disease continued to increase rapidly for some time after the order was enforced, and public confidence in it as a prevention soon gave way to ridicule."

The number of newly reported cases of Spanish Flu did not begin to subside in Edmonton until

December, more than six weeks after the mask mandate was enacted. (Exhibit 9)

54.     It has been observed that the failure of cloth masks to prevent disease transmission during

the Spanish Flu of 1918-1919 despite widespread use is proof of the ineffectiveness of cloth

masks at preventing disease transmission. (Exhibit 10) Cloth masks have not been used for any

13

pandemic in the United States since that time—until COVID-19, when the science that disproved their effectiveness has been forgotten or ignored.

55.    In the 1930s, electron microscopes were developed. Scientists could see viruses for the first time.

56.    In the same decade, surgical masks with superior filtering abilities were developed.

57.    The debate about the effectiveness of cloth masks at preventing disease transmission continued in the United States until the 1960s, when several papers were published showing the ineffectiveness of cloth masks, especially after more than *10 minutes* of use. A review of these papers, among others, is found in Spooner's 1967 paper, *History of Surgical Face Masks*. (Exhibit 11)

58.    By the end of the 1970's, cloth masks were no longer allowed in any American hospital as personal protective equipment (PPE).

59.    In the United States, most research on cloth masks stopped at this time and the debate ended. Cloth masks were ineffective.

60.    In 2011, Yang et al published *Mask-wearing and Respiratory Infection in Healthcare Workers in Beijing, China* in the Brazilian Journal of Infectious Diseases. In it, they found nurses who wore cloth masks had significantly higher incidences of respiratory illness in comparison to nurses who wore surgical masks. (Exhibit 12)

61.    In 2015, MacIntyre et al, published *A Cluster Randomised Trial of Cloth Masks Compared with Medical Masks* in BMJ Open and found nurses who wore cloth masks had significantly higher rates of respiratory illness than those who wore medical masks. (Exhibit 13)

62.    The experiments in ¶60 and ¶61, were funded by 3M, a company that produces surgical masks. Strikingly absent from them is the control—a group that does not wear any masks. If

14

there had been a control, the possibility would have existed that both cloth masks and the

surgical masks made by 3M would have been inferior to or shown no benefit over wearing no

mask.

63.     Companies cannot make money off people who do not use their product because it is not

needed or effective. For this reason, companies will always fund trials without controls unless

forced to use a control by a regulatory agency such as the FDA.

   **B. COVID-19**

64.     A newly recognized disease called COVID-19 was announced by the World Health

Organization (herein referred to as WHO) on January 5, 2020.

65.     On January 30, 2020, the WHO declared the COVID-19 outbreak a "Public Health

Emergency of International Concern."

66.     During a public health crisis, including but not limited to pandemics like COVID-19,

government agencies and leaders, including but not limited to the CDC, the FDA, Dr. Anthony

S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the City-County of Indianapolis, the

St. Joseph County Health Department, the St. Joseph County Council, the Elkhart County Health

Department, and the Elkhart County Council, are afforded some emergency powers to

*reasonably* address public health and safety issues. For the past 100 years, these measures have

only violated Rights when they involved isolating sick people and arranging for their treatment

and quarantining the exposed—time proven methods of disease control.

67.     COVID-19 has (as reported on Google from the New York Times August 16, 2021)

reportedly killed 4.63 million people worldwide since December 2019 when it was first

discovered (578 days or 19 months). This is about 0.06% of the total population of the world. For

15

comparison, 2.5% of Camp Grant's population had died in a few weeks from Spanish flu. None

of the COVID-19 mutations have even come close to hitting those rates of death.

68.     COVID-19 is not a public health crisis. Case-fatality rates are lower than those of

pandemic influenza, such as the one from 2017-2018—you are more likely to die from pandemic

influenza if you get it than you are to die from COVID-19 if you get it.

**C. Mandating Non-Medical Devices**

69.     On February 5, 2020, Dr. Anthony S. Fauci stated in an e-mail to Sylvia Burwell: "The

typical mask you buy in a drug store is not really effective in keeping out virus, which is small

enough to pass through the material." At the time, cloth and non-medical masks and facial

coverings (herein referred to collectively as "non-medical masks" or "mask apparel") were not

allowed to be sold in the United States. The masks Dr. Anthony S. Fauci was referencing were

surgical masks, which are regulated by the FDA for breathability and effectiveness. Still, he

maintained that the melt-blown fabric was not effective at preventing viral transmission because

"virus... *is small enough to pass through the material*" [Emphasis added.]

70.     Electron micrographs confirm that Dr. Anthony S. Fauci's conclusions made in the e-

mail referenced in ¶69 are true.

71.     Mask apparel does not have to meet any filtration standards and can allow even larger

particles to pass through them.

72.     The virus has not significantly grown in size since Dr. Fauci sent the e-mail referenced in

¶69.

73.     Officials like to cite the number of individuals who contracted COVID-19 to support

their emergency declarations.

74.     COVID-19 testing, especially rapid testing, is highly inaccurate. For example, 7 out of every 10 asymptomatic people who test positive on a rapid test do not really have COVID-19. More concerning, 1 out of every 2 asymptomatic people who test negative actually have COVID-19 and should have been isolated.

75.     This makes rapid testing for asymptomatic people less accurate than random guessing. It also means that many people who have tested positive and gone into the statistical numbers, did not actually have it and were kept isolated for two weeks without reason.

76.     After the initial push for a "rapid" test, little is being done to create an accurate test.

77.     Since the beginning of the COVID-19 pandemic, there have been problems with all COVID-19 tests providing inaccurate results.

78.     Declaring a public health emergency should not rely on the results of testing that is known to be inaccurate.

79.     During COVID-19, inaccurate numbers alone have been the basis of determining a public health emergency and enacting Rights-inhibiting mandates.

80.     Numbers of cases collected through observational data can be misleading even if they are the result of accurate tests. For example, if hundreds of thousands of mask-wearing tourists from other states enter Florida and bring COVID-19 with them on their bacteria laden masks, Florida numbers will rise. This rise in cases will have nothing to do with Florida's lack of a mask mandate.

81.     The CDC and news agencies have focused on large states, such as Texas and Florida, when reporting the dangers of not wearing masks, but it ignores other large states like California and New York.

17

82.    Per population New York has had higher peaks than Florida in daily case numbers throughout the entire pandemic despite its mask mandates. Florida not only has a population that is about three times larger than New York but it is also one that is filled with elderly who are more susceptible to diseases like COVID-19. Florida currently has anti-mask mandates and has not mandated masks throughout the pandemic. It also did not initially lock down as long as other states and allowed spring break vacationers into its state.

83.    Numbers can be manipulated when the CDC or news agencies group two or three days together into one days' report. This was done at the beginning of the pandemic and is now being done with Florida's data. It mathematically drives up not only that day's new case numbers but also the 7-day average.

84.    The CDC, Dr. Anthony S. Fauci, and the FDA are non-elected officials who are making public recommendations and policies. Not only are they the ones collecting data about their mask experiment, they are also the ones reviewing that data, the ones interpreting that data, and the ones choosing what data is released to the public. If elected officials or other doctors disagree with the CDC, Dr. Anthony S. Fauci, and the FDA, these Defendants publicly complain about the officials or the states from which the officials come.

85.    There is no third-party oversight of the CDC and FDA policies. Scientists around the world have questioned CDC policies. The media shuns the scientists, and the CDC and FDA do not answer the questions raised with direct evidence. That is not science. That is tyranny.

86.    After the CDC first stated mask apparel "*may* prevent asymptomatic spread," [emphasis added] the National Academies of Sciences, Engineering, and Medicine (herein referred to as the "NAS"), contradicted this statement in a literature review titled Rapid Expert Consultation on the

Effectiveness of Fabric Masks for the COVID-19 Pandemic (April 8, 2020) and the

correspondence related to it (herein referred to collectively as "Rapid Response") stating,

> "The evidence from these laboratory studies suggests that while
> fabric masks may reduce the transmission of larger respiratory
> droplets, there is little evidence regarding transmission of small
> aerosolized particulates of the size potentially exhaled by
> asymptomatic or presymptomatic individuals with COVID-19."
> (Exhibit 14)

87.     In the Rapid Response, one of the noted experiments found that a two-layer cloth mask

mand from handkerchief material would only prevent 0.7% of small particles from getting

through it. These particles were saline droplets more than twice the size of a COVID-19 virus. In

order to prevent at least half of the comparatively large saline droplets from getting through the

cloth by increasing the number of layers and changing the fabric, breathing would be

significantly hindered.

88.     The NAS' paper called for more quality research (randomized controlled trials) on the

safety, effectiveness, and design of cloth masks.

89.     Since the NAS Rapid Response, most studies published concerning cloth masks are

circumstantial evidence such as laboratory studies, which employ artificially created aerosols

with droplets in the *visible range* as opposed to the droplets that asymptomatic or

presymptomatic people regularly breath that are smaller than a single blood cell. They also do

not employ droplets the size of viruses. These are the types of studies the NAS relied upon in

their Rapid Response, which the NAS then declared to be inadequate.

90.     Modeling studies, which are not easily replicable and for which modelers can easily

adjust the input numbers or parameters to achieve the desired results, are also in great supply.

These have little scientific value, especially when they are used to predict future events based on

past unknowns. Observational studies collect data weeks after an event occurred.

91.     Theoretical laboratory studies and modeling studies conducted prior to their destruction determined the Twin Towers in New York (which were destroyed when airplanes flew into them on September 11, 2000) could withstand the impact of a 747. As we now know, these modeling studies were grossly wrong.

92.     Strikingly absent from post-COVID-19 published mask apparel research are large, significant, peer-reviewed, randomized controlled trials—the gold standard of medical research that the NAS requested. Large, significant, peer-reviewed, randomized controlled trials are science's direct evidence—where the experiment is observed and recorded as it is performed.

93.     As Feder stated in *Why Truth Matters: Research versus Propaganda in the Policy Debate*, "…In "truthful" research, the answers are what they are, regardless of the researcher's point of view. By contrast, "propaganda" starts with an answer and relies on research not to find out how things work but to prove a predetermined conclusion." It is easy to manipulate laboratory studies, modeling studies, and observational studies into propaganda, in the same way speculative inferences based on circumstantial evidence can cause a trier of fact to make a leap of logic that is not supported by direct evidence. (Exhibit 15)

94.     For example, on July 17, 2020, an observational study misleadingly titled "Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy—Springfield, Missouri, May 2020" has been touted by the CDC as evidence that masks prevent the spread of COVID-19. This paper is not science but propaganda.

95.     In the paper mentioned in ¶94, it is admitted that one masked hair stylist gave COVID-19 to the other masked hair stylist. This transmission was attributed to improperly wearing and

removing the mask: This is not an "Absence of Apparent Transmission" especially since most people wear masks incorrectly.

96.     In addition, the observational study mentioned in ¶94 states that of the 139 clients that were exposed, only 67 were tested for COVID-19. That means potentially 72 people could have contracted COVID-19 from the hair stylists, but we will never know if they did or did not. Of the 67 who tested positive—they were only tested once. Up to 11 of them could have had a false negative test, but we will never know since the tests were not confirmed 2 days after the first test. Again, this is not an "Absence of Apparent Transmission," but an observational study with incomplete data.

97.     It requires deviousness to manipulate direct evidence data from large, randomized controlled trials, similar to the one conducted by the U.S. military during the Spanish flu, especially when these experiments achieve significant results and are peer-reviewed by third parties. In addition, it is easy for scientists to recognize when a randomized controlled trial has been manipulated because it is usually closed early and premature results are published.

98.     To further understand how a randomized controlled trial relates to direct evidence, consider Jonas Salk's injectable polio vaccine, which was tested on more than 1 million participants over a year using a randomized controlled trial in addition to trials without controls. All the results were reviewed by a third-party scientist. Salk's vaccine is still considered comparably safe and effective, and we have directly observed data to support those claims.

99.     In contrast, Albert Sabin's oral polio vaccine was tested in one trial without any control. Although Sabin's oral version was initially tested on 10 million children, which was 10 times the amount in Salk's experiments, the vaccine is now no longer recommended for use in the United States because it is a major contributor to polio *outbreaks*.

100.    In the middle of a pandemic, having *additional outbreaks* because masks were never properly tested is far more dangerous than doing nothing. Without scientific data that is direct evidence we can cause more harm than good.

101.    The CDC, Dr. Anthony S. Fauci, the FDA, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council (herein collectively referred to as "Government Defendants") in this case, have not conducted any large, significant, peer-reviewed randomized controlled trials to obtain direct evidence on mask apparel nor do they seem to be funding them. On the contrary, much money has gone into mask apparel propaganda, distributing free, medically risky mask apparel, and providing free, inaccurate rapid testing.

102.    All statements made about the effectiveness of these masks to stop disease transmission are not made based on direct evidence but on circumstantial evidence.

103.    In its Rapid Response, the NAS neglected to address the direct evidence from the randomized controlled trial that the U.S. military performed during the Spanish Flu or comment on the research referenced in the Historical Scientific Background section of this Complaint because they were unaware of that research and unable to do an in-depth, longer study of the topic.

104.    The FDA Emergency Use Authorization (herein referred to as "EUA") dated April 18, 2020 and updated May 2020, allowed mask apparel to be sold in the United States with strict restrictions. (Exhibit 16)

105.    On April 24, 2020, the FDA issued a letter restating what they said in the EUA—that

> "the labeling *must not state or imply* that the product is intended
> for antimicrobial or antiviral protection or related uses or is for use

22

> *such as infection prevention or reduction*;" [Emphasis added.].
> (Exhibit 17)

106.    The FDA is required by law to regulate medical devices. At the time it issued its

emergency authorization letter, it knew the CDC was recommending mask apparel for a medical

purpose, but still refused to regulate them itself, in violation of the Food, Drug, and Cosmetics

Act.

107.    The FDA, Dr. Anthony S. Fauci and the CDC were aware of the Rapid Response and that

2 layers of cloth cannot stop bacteria. The FDA, Dr. Anthony S. Fauci, and the CDC were aware

that even 2 layers of cloth can cause breathing resistance that may lead to health problems. The

FDA and the CDC were also aware that all medical interventions including but not limited to

mask apparel can have negative side effects that are sometimes serious, especially in certain

subpopulations.

108.    The FDA, Dr. Anthony S. Fauci, and CDC were aware that the FDA issued its EUA

referenced in ¶104 and ¶105, at the time Dr. Anthony S. Fauci was recommending masks in

public statements, and at the time the CDC issued its recommendations for mask apparel, that

direct evidence in the form of randomized controlled trials had not been performed on disposable

non-medical masks and that these masks, as with any medical device, may present a risk to

certain subpopulations such as those with asthma or COPD, children under the age of 12, and

pregnant women.

109.    Further, the CDC knew that it was recommending mask apparel for a medical purpose at

the time the FDA only gave authorization for mask apparel to be labeled and regulated as

apparel, in violation of 18 U.S.C. § 1035 and other laws.

110.    Police powers allowed to a State during medical emergencies are limited by the U.S.

Constitution and Federal Law and case law to medical treatments and medical devices of proven

ability to treat disease or prevent disease transmission, all of which should be regulated by the FDA under the Food, Drug, and Cosmetic Act even in emergency situations.

111.    Early, accurate identification and isolation of sick individuals is the only public health method that has reduced disease transmission across all diseases for over a century.

112.    Instead of spending the past year developing solid methods of identifying those who are truly sick and isolating them as quickly as possible, governments have spent valuable resources attempting to encourage and force healthy people to wear masks, which are not worn properly by those same government officials and which collect viruses and bacteria and spread disease. The inability of the general public to correctly wear masks of any kind (including surgical or N-95), have kept the United States from mandating them for 100 years.

113.    Experimental medical devices and treatments cannot be forced upon humans for research purposes without informed consent Title 45 §46.116. Investigational medical devices should have cautionary labeling that is not being mandated on any masks, which is in violation of 21 CFR § 812.5.

114.    There is a big difference between offering a dying patient the option of trying an experimental drug, which would be ethical, and between forcing a person who is not dying to try an experimental device that may not only harm his or her health and may increase the spread of disease to others, which is entirely unethical.

115.    The CDC and Dr. Anthony S. Fauci conducted research on the citizens of the United States, including Jennifer Reinoehl, without their consent by collecting medical data on mask use and COVID-19 after recommending everyone in the United States wear masks, publishing harassing statements about those who do not wear masks, encouraging states to mandate masks, and mandating mask use on airplanes.

24

116.    U.S. Government Agencies are performing and encouraging others to perform observational experiments on masking and using that circumstantial evidence to support mandates instead of performing and publishing the direct evidence from large randomized controlled trials that is needed for a determination of the risks and benefits (if any) of wearing mask apparel by the general public. Had they conducted the required randomized controlled trials instead of observational studies, they could have easily obtained medical consent from those who wanted to participate in that research.

117.    Under the Equal Protection Clause of the 14th Amendment, human research volunteers do not have more rights than a citizen. Citizens cannot be mandated to participate in an experiment when research volunteers cannot be mandated to participate in one.

118.    Mask apparel can only be sold in the United States under the FDA EUA referenced in ¶104 and ¶105 above as "non-medical" devices and must be clearly labeled as such. These "non-medical" masks are being classified by United States government agencies including but not limited to the FDA as "apparel," and therefore are considered exempt from FDA regulation.

119.    No State can compel individuals to wear specific apparel simply because there is an emergency medical situation. The State's rights to regulate the apparel of its citizens are limited to regulations made for morality purposes. To regulate apparel on the basis of health would be akin to mandating citizens wear coats in the winter and shorts in the summer. Coats and shorts, at the appropriate times, *may* also provide a health benefit.

120.    No business can compel a disabled individual to wear certain apparel that their doctor has exempted them from wearing. If businesses could, a disabled person without legs could be forced to wear shoes in order to enter a place of business—thereby a business could easily restrict the disabled from access to it.

121.     As "apparel," all non-medical masks are only minimally regulated by the Federal Trade Commission and the U.S. Consumer Product Safety Commission. These products must only meet minimal safety standards: (a) they must not contain lead if they are targeted at children, and (b) they must be fire resistant if they are targeted at children. Adult mask apparel is not being regulated for lead content even though they are worn across the mouth and nose in some cases for hours at a time.

122.     No mask apparel is being regulated for hazardous materials, including but not limited to asbestos or chromium. No mask apparel is being regulated for their breathability or for their filtering ability even though all surgical masks, which are for "medical" use, must meet regulation standards for breathability and filtration ability.

123.     The "face covering" as defined by Governor Eric J. Holcomb in his mask apparel mandate first issued in Executive Order 20-37 on July 24, 2021, (herein referred to as "Gov. Holcomb's Mask Mandate") is "a cloth, preferably with two layers of material, which covers the nose and mouth and is secured to the head..." Governor Eric J. Holcomb states he was "utilizing a data-driven approach to make decisions based on facts, science..." Recent and century-old peer-reviewed scientific evidence has concluded two layers of cloth is not enough to prevent the spread of any virus, including COVID-19, even if the cloth is denim.

124.     The State of Indiana has more than 759,000 confirmed cases of COVID-19 as reported by Google July 8, 2021. Indiana mask regulations were in effect since Governor Eric J. Holcomb issued Executive Order 20-47 (July 13, 2020) until April 6, 2021. Even with mask mandates firmly in place, cases spiked to a 7-day moving average of more than 4,000 per day from November 8, 2020 to January 16, 2021.

125. An effective health measure, such as hand washing or covering coughs, works even when there is not 100% compliance.

126. An effective method of reducing disease transmission works with even 1% compliance because it reduces the amount of transmission by at least 1%.

127. Mask apparel has failed to prevent the spread of COVID-19 just cloth masks alone failed to prevent the spread of Spanish Flu.

128. COVID-19, like most diseases, is cyclic. Last year there were peaks of cases in April, July-August and November-January. This year there were also peaks of cases in April and July-August, and if we continue testing for COVID-19 as frequently as we have been doing, there will be another large peak November-January 2021. Mask mandates will not prevent or reduce these peaks just as they did not prevent or reduce them last year.

129. Eradication of smallpox involved a concerted effort that started centuries ago and when the plan for early identification and quarantine of sick individuals was finally put in place along with other public health measures, it still took a decade to complete. Smallpox cannot infect animals and was a candidate for eradication because of this.

130. COVID-19 can infect and be transmitted by animals, therefore is not a good candidate for eradication. It is impossible to mask, vaccinate, and dictate the behavior of all the animals in the United States. If it were, we would no longer have any indigenous cases of bubonic plague. It is futile for governments and businesses to attempt eradication and preventing the spread of COVID-19 instead of focusing their efforts on better treatment methods and living with the disease, just as we live with other colds and with the flu each year, both of which can be deadly.

**D. Mask Dangers**

27

131.    Wearing masks improperly can spread disease as noted by the Secretary of the Navy in 1919 and the U.S. Surgeon General on March 27, 2020. (Exhibit 18)

132.    The mask mandates put in place by Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council concerning restaurants ignore the fact that to properly remove a mask, you must touch only the strings, immediately throw it in the trash and wash your hands to prevent the spread of disease. To put on a new mask, you must wash your hands prior to touching the mask and putting it on your face.

133.    These unscientific mask mandates for restaurants require individuals to walk to their tables and then remove their masks without being able to immediately deposit them in a trash can or wash their hands. As written, it encourages patrons to place their dirty, bacteria laden masks on an eating surface. It forces patrons to then eat with dirty, bacteria laden hands. It discourages people from washing their hands before eating at all because they would need to put on their mask to walk to the restroom and do it. Since they have to remove their bacteria laden mask after returning to their seat, washing their hands would be futile.

134.    Restaurant mandates mentioned in ¶132 and ¶133 also encourage patrons to reuse dirty, bacteria laden masks after they have been on the table collecting more bacteria and viruses. Even if a patron has brought his on her own plastic baggy for the dirty mask and an extra clean mask to put on after eating, the patron is still not able to wash his or her hands after removing the mask, immediately before eating, or before putting on the clean mask.

135.    If the cleanser used on the table between patrons is not powerful enough to destroy all the bacteria and viruses on the table from the mask being set on it (and not all bacteria and

28

viruses are susceptible to all cleaners), everyone who sits at that table and places his or her mask on it will be contributing to the spread of disease. Plaintiff has not found any randomized controlled trials that determine the effectiveness of any cleaners against COVID-19 and has only found one trial of cleaners and methods against coronaviruses in general.

136.    At a buffet, where people all touch the same serving utensils, masked individuals become even more dangerous by transferring the bacteria from their hands to those utensils after removing and reapplying their masks—potentially numerous times.

137.    Consider the alternative: A person walks into the restaurant without a mask, goes to the bathroom to wash his or her hands, eats, and leaves. A patron wearing a mask has exposed his or her nose and mouth to more bacteria from his or her hands than the person who was not wearing the mask because the person who was not wearing a mask had the opportunity to wash his or her hands and begin to eat without touching anything else.

138.    Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council's decisions concerning masks were not made based on all the existing scientific evidence, including but not limited to the evidence presented by the U. S. military after the Spanish flu, nor were they made based on the FDA's decision to classify cloth and non-medical masks as apparel whose manufacturers could not make claims it prevents the spread of disease, nor were they made based on direct evidence from randomized controlled trials Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council conducted using any facial coverings. In the case of their restaurant

29

mandates, the CDC has clearly placed accurate methods of removing masks, which include the importance of throwing them away immediately and washing hands, on its website, so Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council did not base their decisions on that science. Instead, they exchanged scientific knowns like washing hands to prevent the spread of disease with illogical unknowns like wearing a mask to keep your neighbor safe.

139.    Dr. Anthony S. Fauci, Dr. Kristina M. Box, and Governor Eric J. Holcomb have all worn masks improperly and spread the bacteria collecting on them to their hands directly and to everything else they touched before washing them indirectly.

140.    Personal protective gear, such as masks, that were improperly put on, worn, and removed, directly contributed to the spread of ebola virus disease during the 2014 pandemic. Even trained medical workers struggled to take off infected protective gear correctly.

141.    On or about October 13, 2021, Jennifer Reinoehl witnessed a St. Joseph County Health official improperly wearing mask at a St. Joseph County Council meeting by reapplying a used mask and by failing to sanitize his hands after placing the mask back on his face. She also witnessed most of the members of the Council itself improperly wearing masks by removing them from their faces and replacing them without sanitizing their hands at any point during the meeting or afterward. Specifically, she witnessed Councilmen Kruszynski removing his mask and playing with it for most of the meeting and witnessed Councilmen Pfeil pull his mask down to take a drink of water from a water bottle and then replacing the used mask. Both touched their masks repeatedly without washing or sanitizing their hands. All three government representatives, including the representative from the St. Joseph County Health Department, left

30

198.    On or about May 2, 2020, Plaintiff's husband, Jason Reinoehl, was notified someone

with whom he had close contact (within 3 feet of distance) at work had tested positive for

COVID-19. Due to mask mandates, Jason Reinoehl and the COVID-19 positive individual were

both wearing cloth masks given to them by their employer at the time of the contact.

199.    On or about May 3, 2020, Jason Reinoehl, a normally healthy individual, began to feel

unwell. On May 4, 2020, Jason Reinoehl was administered a COVID-19 test at a testing site after

being referred there by a doctor. The test results came back positive for COVID-19 on May 7,

2020. The mask did not stop Jason Reinoehl from getting COVID-19.

200.    On or about June 5, 2020, Jennifer Reinoehl had promised her daughter, S.A. that she

would purchase doughnuts for the students and teacher of S.A.'s driver's education class on its

last day. S.A. requested Krispy Kreme doughnuts. Jennifer Reinoehl went to the Krispy Kreme

Store where there was an extremely long drive-thru line that wrapped around the building and

did not appear to be moving. There were only two people in line inside the store.

201.    Jennifer Reinoehl was forbidden entry into the store without a mask. She explained to the

store manager that she had a medical disability and could not wear a mask but was still denied

entry.

202.    Jennifer Reinoehl, having promised her daughter doughnuts, returned to the car, donned a

mask, and waited in line in the store for 10 minutes to get the doughnuts. She had an asthma

attack in the store as a result of wearing the mask. Store employees, including the manager, were

unconcerned she was having an asthma attack. They told her she had the option of going through

the drive-thru if she did not want to wear a mask. They told her that going through the drive-thru

was an acceptable accommodation.

41

160.    Just as it knows the dangers of masks, the FDA knew belladonna was toxic and could cause harmful side effects. Instead of erring on the side of caution, it allowed the drug to be sold without regulation.

161.    The incident in ¶¶158-160 is *not* the only time products that did not have full FDA approval and have caused serious injury or death. (Exhibit 31)

162.    For mask apparel, it is the first time in the history of the FDA that a product without full FDA approval is being mandated, and people are being forced to wear it without knowing what short- or long-term effects that wearing them will have on their health, including the health of the medically disabled, pregnant women, and children.

163.    Without required randomized controlled trials, it takes much longer for the dangers of authorized items to be discovered. Since the observational data is circumstantial in nature, many times things other than the supplement, such as "heart attack," are attributed as the cause of death. It might not even be known that the person who died or suffered an adverse reaction was on any supplements.

164.    If a person dies from an asthma attack, the asthma—not the mask that caused the attack—will be blamed.

**E. Discrimination**

165.    Mask mandates harm disabled people in two ways: (a) by forcing or encouraging a person with a breathing disability to wear a mask, which puts his or her health at risk, or (b) by not wearing a mask, the disabled person is marked as being disabled, or worse marked as being a protester or a selfish person who does not care about whether or not they get others sick. With only these two options available to him or her, a disabled person has no recourse for avoiding either physical or psychological harm.

34

166.    Although the Mask Mandate enacted by Governor Eric J. Holcomb gave an exemption

for people with disabilities, it did not prohibit businesses, such as Menard, Inc., Beacon,

Sephora, Krispy Kreme, and AMC Theaters, (collectively herein "Business Defendants") from

enacting their own mask rules and policies that prevent disabled people from entering. Further,

Governor Eric J. Holcomb specifically states in #7 of the mandate that

>   "Nothing in this Executive Order prohibits a county, political
>   subdivision, or school corporation from imposing more stringent
>   requirements than this Executive Order"

thereby, Governor Eric J. Holcomb's mandate specifically allowed county, political subdivision,

or school corporation to make their own requirements without the exemptions. This addition

encouraged businesses to do likewise.

167.    Like Governor Eric J. Holcomb, orders and mandates enacted by Dr. Kristina M. Box,

the Marion City-County Council, Marion County Health Department, the St. Joseph County

Council, the St. Joseph County Health Department, the Elkhart County Health Department, and

the Elkhart County Council did not prohibit discrimination against the disabled, they merely

"exempted" them from wearing masks. The exemptions did not prevent disabled people from

being harassed or denied entrance to businesses and public areas by the police and employees of

businesses. Some, such as the Elkhart County mandate required specific documentation to

receive the exemption. Requiring specific documentation of a disability to receive

accommodations is in violation of the ADA and the 4th Amendment. Others, such as the St.

Joseph County mandate, fined businesses if they were caught with shoppers inside them who

were not wearing masks. Again, this encouraged businesses not only to enact policies, such as

denying entry to the disabled, that would protect them from fines, but also forced businesses that

did not enact these policies to search medically disabled citizens in violation of the ADA and 4th

Amendment.

168.     Governor Eric J. Holcomb created public environments that were hostile to disabled individuals with Executive Order 20-48 by requiring every business in Indiana to post "clearly visible signage at their public and employee entrances notifying that face coverings are required for *all* individuals entering the business" [Emphasis added]. The Governor made no mention of including the exemptions on the signage.

169.     The IDHHS lead by Dr. Kristina M. Box contributed to a hostile and discriminatory environment toward the disabled throughout the state by promoting mask wearing as an act of kindness. Some of these promotions included printable signs they made available to the public that stated "I wear my mask for..." and showing a child on their website wearing a mask with a sign that was filled in to read, "I wear my mask for grandma and grandpa." The website encouraged people to make similar photos with the signs and post them on the Internet and provided them an outlet to do so. It also had statements like "the best way you can be a good neighbor is to wear your mask when you're in public." By promoting the false belief that people who did not wear masks were not good neighbors and did not care about others, they increased the hostility and discrimination toward the disabled who could not wear mask apparel. (Exhibit 32)

170.     The Marion County Health Department, the St. Joseph County Health Department, the Elkhart County Health Department all falsely promoted that they had direct evidence supporting their claims that mask apparel was effective at stopping disease transmission. None of them promoted the fact that many people not wearing masks were disabled and could not safely wear them.

171.     The Business Defendants have enacted discriminatory policies toward disabled people who are unable to wear mask apparel which is in violation of the ADA. Since the mandates

the meeting with viruses and bacteria on their hands from their masks and made it easier to pass those germs to other people through everything they touched. All three government representatives reapplied dirty masks to their faces—increasing their chances of infecting themselves with bacteria and viruses collected on them.

142.     Despite the CDC guidelines stating masks should fit well, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, and Dr. Kristina M. Box have worn masks that are loose fitting with large gaps between their faces and the mask.

143.     Dr. Anthony S. Fauci has touched his mask while wearing it and removed it without washing his hands immediately afterward.

144.     Governor Eric J. Holcomb and Dr. Kristinia M. Box have touched their masks while wearing them.

145.     Whenever masks fail to prevent the spread of disease, improper methods of wearing them are blamed (i.e. the user and not the mask). However, if no person can wear masks correctly for long periods of time, then they are not an effective method of disease control. Instead, they are effective methods of disease *transmission,*

146.     Government officials and agencies are making excuses about improper use when people wearing masks get sick, even though they know and have known few can wear them properly. Government agents and agencies keep their tyrannical mandates in place—which in some cases, such as in restaurants, force all citizens to use masks improperly.

147.     Disposing of masks improperly spreads disease as much as wearing masks incorrectly. Masks are littering the world and causing biohazard and ecological problems.

148.     Regardless of their filtering ability, masks collect bacteria and viruses from the environment and from the person wearing them on their surfaces. A person who touches his or

her mask for any reason will then have all the bacteria they exhaled on their hands—making it easier to transmit to others. They will also have all the bacteria that was around them from other people on their hands.

149.     When the mask is disposed of, it breaks down into microplastics, on which diseases such as COVID-19 continue to live and can continue to infect others. (Exhibit 19, 20)

150.     Masks of any kind, including but not limited to N-95s, surgical masks, and cloth masks, can cause negative health changes even in healthy individuals, including but not limited to reduced blood oxygen levels (SpO$_2$%), lightheadedness, increased heart rate, increased exposure to all infectious diseases. (Exhibit 21-29)

151.     Notably: long term use of cloth masks (niqab) can reduce lung capacity and lead to increased respiratory infections and asthma. COVID-19 is a respiratory infection. (Exhibit 21-29)

152.     Jennifer Reinoehl has breathing and heart issues, including but not limited to asthma and tachycardia. Wearing a cloth or non-medical mask for 15 minutes or longer increases Jennifer Reinoehl's heart rate, increases her oral body temperature by 1 degree Fahrenheit, and decreases her blood oxygen levels, starting at 20 minutes after first donning the mask and continuing for up to two hours after taking it off. This does not happen if Plaintiff performs the same activities without a mask. Without a mask, her heart rate elevates during the activity, but returns to normal within 15 minutes of stopping activity. Without a mask, her oxygen levels remain stable even when active and after ceasing the activity.

153.     Cloth masks, when tested for breathability, all failed European standards.

154.     It is unknown what effect long-term use of masks will have on individuals, especially the medically disabled, children, and pregnant women.

155.    Even surgeons do not wear masks for 8 hours a day or more every single day of their lives.

156.    Surgeons who wear surgical masks for several hours without break, suffer from low blood oxygen and its effects even though surgical masks are regulated as medical devices and must meet breathability standards.

157.    Having full FDA approval does not guarantee a medical device or drug is risk free. However, without full FDA approval the risk is greatly increased. In some cases when the FDA grants authorization to sell an item instead of full approval, it knows the product is or contains something hazardous to human health.

158.    For example, supplements, which like mask apparel are not fully approved by the FDA, have led to multiple health problems in users. When searching for oral teething gels in or around 2006-2007, Jennifer Reinoehl noted a homeopathic one on the shelves at Meijers located on Grape Road in Mishawaka, IN, when she could not find the one she normally used. Jennifer Reinoehl is, however, an avid label reader. When she read the label, she noted that the teething product contained "Belladonna extract." She knew instantly that "belladonna" is also called "deadly nightshade." She was aghast that the government would allow deadly nightshade to be placed in something that goes in an infant's mouth. She knew homeopathic remedies were much diluted and trusted the FDA had determined the dilution to be at a low enough level so as to be safe, but she still refused to purchase the product for her own child and moved it to the back of the shelf in hopes of delaying others from purchasing it.

159.    In 2010, after the homeopathic product containing belladonna had been on the market for more than three years, the FDA finally determined the product was dangerous and began warning against it. (Exhibit 30) Many babies were harmed by this product while it was available.

enacted by the Government Defendants have not explicitly prohibited discrimination against those exempted nor have they explicitly required ADA compliance, the mandates have been made in opposition to the Constitution and Federal Law and have allowed businesses to discriminate against those who are medically disabled. Further, the Government Defendants encouraged through propaganda and through fines and other legal means Businesses to discriminate.

172.    Despite Government Defendants mandates and pressure, other businesses Jennifer Reinoehl visited (a) harassed her, but did not prevent her from shopping or (b) neither harassed her nor prevented her from shopping. Walmart and Martins, for example, asked her about wearing a mask but only required her to state she had a disability.

173.    Beacon, specifically, has failed to enact consistent, scientifically supported policies including accommodations for the medically disabled who cannot wear masks. Beacon's mask policies consistently and with their full knowledge, go beyond the recommendations, policies, orders, and mandates—to the great harm of the medically disabled, such as Jennifer Reinoehl. Because of this, Beacon has created a barrier that makes it difficult for the medically disabled to obtain health care for themselves or their loved ones.

174.    At all times relevant and material hereto, Beacon owned and operated Memorial Hospital on 615 North Michigan Street, South Bend, Indiana (herein "Memorial Hospital"), Beacon Main Street Medical Group on 6913 North Main Street, Mishawaka, Indiana (herein "Main Street Medical Group"), and Beacon Granger Hospital on 3220 Beacon Parkway, Granger, Indiana (herein "Beacon Granger Hospital").

175.    At all times relevant and material hereto, Memorial Hospital, Main Street Medical Group, and Beacon Granger Hospital were open to the public during defined business hours.

37

176.    Beacon created and implemented a policy or practice at all its locations of denying entry to all persons without face coverings. This policy remained in place even when the face mask orders were removed. Further, contrary to the orders, mandates, and recommendations by government agents and agencies, Beacon's policy or practice did not include an exception for people whose medical conditions or disabilities prevented them from wearing a face covering.

177.    At all times relevant and material hereto, Jennifer Reinoehl posed no direct threat of physical harm to herself or to any other person inside Memorial Hospital, Main Street Medical Group, or Beacon Granger Hospital.

178.    At all times relevant and material hereto, Menard owned and operated a retail store on 365 West University Drive, Mishawaka, Indiana (herein the "Menard Store").

179.    At all times relevant and material hereto, the Menard Store was open to the public during defined business hours.

180.    Menard, Inc. created and implemented a policy or practice at all its locations of denying entry to all persons without mask apparel. This policy remained in place even when the face mask orders were removed. Further, contrary to the orders, mandates, and recommendations by government agents and agencies, Menard, Inc.'s policy or practice did not include an exception for people whose medical conditions or disabilities prevented them from wearing mask apparel.

181.    At all times relevant and material hereto, Jennifer Reinoehl posed no direct threat of physical harm to herself or to any other person inside the Menard Store.

182.    At all times relevant and material hereto, Sephora owned and operated a Sephora retail store in University Park Mall, Mishawaka, Indiana (herein the "Sephora Store").

183.    At all times relevant and material hereto, the Sephora Store was open to the public during defined business hours.

184.   Sephora created and implemented a policy or practice at all its locations of denying entry to all persons without mask apparel. Further, contrary to the orders, mandates, and recommendations by government agents and agencies, Sephora's policy or practice did not include an exception for people whose medical conditions or disabilities prevented them from wearing mask apparel.

185.   At all times relevant and material hereto, Jennifer Reinoehl posed no direct threat of physical harm to herself or to any other person inside the Sephora Store.

186.   At all times relevant and material hereto, Krispy Kreme owned and operated a Krispy Kreme retail store on 5615 North Main Street, Mishawaka, Indiana (herein the "Krispy Kreme Store").

187.   At all times relevant and material hereto, the Krispy Kreme Store was open to the public during defined business hours.

188.   Krispy Kreme created and implemented a policy or practice at all its locations of denying entry to all persons without mask apparel. This policy was put in place even before the face mask orders were instated. Further, contrary to the orders, mandates, and recommendations by government agents and agencies, Krispy Kreme's policy or practice did not include an exception for people whose medical conditions or disabilities prevented them from wearing mask apparel.

189.   At all times relevant and material hereto, Jennifer Reinoehl posed no direct threat of physical harm to herself or to any other person inside the Krispy Kreme Store.

190.   At all times relevant and material hereto, AMC Theaters owned and operated AMC Classic Elkhart 14 on 2701 Cassopolis Street, Elkhart, Indiana (herein the "AMC 14").

191.   At all times relevant and material hereto, AMC 14 was open to the public during defined business hours.

192.    AMC Theaters created and implemented a policy or practice at all its locations of denying entry to all persons without mask apparel. Further, contrary to the orders, mandates, and recommendations by government agents and agencies, AMC Theaters policy or practice did not include an exception for people whose medical conditions or disabilities prevented them from wearing mask apparel.

193.    At all times relevant and material hereto, Jennifer Reinoehl posed no direct threat of physical harm to herself or to any other person inside AMC 14.

194.    All the Defendants played an equal role in the discrimination Plaintiff suffered without cause preventing Plaintiff from entering places of public accommodation in violation of the ADA.

195.    All the harassment Plaintiff has suffered from businesses not listed as Defendants and those in government employ who are not listed as Defendants is a direct and proximate cause of the orders, mandates, propaganda, and recommendations of the Government Defendants.

196.    The Business Defendants played an equal role with the Government Defendants in the harassment Plaintiff suffered at Memorial Hospital, Main Street Medical Group, Beacon Granger Hospital, Sephora Store, Menard Store, AMC 14, and Krispy Kreme.

197.    In addition to the Government buildings and 5 Business Defendants referenced in this Complaint, Jennifer Reinoehl is aware through experiences told her by other disabled persons and their spouses and loved ones that many other businesses throughout Indiana, in an attempt to follow the recommendations, orders, and mandates enacted by the Government Defendants have harassed, discriminated against, and prohibited those with medical disabilities similar to Jennifer Reinoehl from using public accommodations.

**F. Chronology**

40

203. At the time, the drive thru line wait was at least one hour long. Jennifer Reinoehl did not have air conditioning in her vehicle, and it was a hot day.

204. Jennifer Reinoehl reported the incident through the online complaint process, but Krispy Kreme has never contacted her about the incident to the best of her knowledge.

205. Separate benefit that is not as good as the one provided to others is forbidden in 42 US Code § 12182 (b) (1) (a) (iii). Waiting in line for an hour or more in the heat is not as good as spending (10) minutes in an air conditioned store, especially when gas usage is considered. Further, waiting in line for an hour in the heat, which reached up to 89°F that day, could make Jennifer Reinoehl's medical conditions much worse.

206. On or about July 28, 2020, Jennifer Reinoehl tried to enter the Potawatomi Zoo in South Bend, IN, without a mask. D.W. witnessed this event. The Potawatomi Zoo entrance was completely outdoors at the time, required timed tickets, and the line was spaced so families were 6 feet apart. Jennifer Reinoehl was harassed at the entrance for not wearing a mask, called a "Karen" by a zoo employee who also inferred she should be the subject of a "Tik Tok video," and had to call Governor Eric J. Holcomb's office so the zoo manager could clarify that people with disabilities were exempt from his order. After hanging up the phone, Jennifer Reinoehl was told by the manager that she would be admitted that day, but the zoo would contact its lawyer. The manager also warned Jennifer Reinoehl that she might be completely forbidden entry the next time she visited based on the results from that contact and that she could not ride the zoo train or carousel. After that initial bad experience, she was never harassed at Potawatomi Zoo again.

207. While on the phone to the Governor's Office, Plaintiff informed them that the mandate as written was not clear.

42

208.   Since she was never barred from entering the Potawatomi Zoo, it is not a Defendant in

this case, but the incident is an example of the extreme harassment Plaintiff has been subject to

as the result of the CDC's recommendations, and Indiana State and local government mandates

and the ambiguity in their recommendations and mandates about the "exemptions." Plaintiff

should not have had to face harassment by businesses until the business contacted its lawyer(s)

simply because she has a medical disability. Plaintiff should not have had to call the Governor's

office so it could clarify the legal implications of the mandate.

209.   On or about September 25, 2020, Jennifer Reinoehl and her husband, Jason Reinoehl, had

reserved tickets online at AMC 14 in Elkhart for their anniversary. Upon entering the theater,

which was nearly empty (there were no other customers inside that could be seen and only a few

cars outside), Jennifer Reinoehl was told she could not watch the movie even though she

informed the manager she had a disability and could not wear a mask. It would have been easy

for her and her masked husband to stay 6 feet away from any other patron since there were few

(if any) people in attendance. The manager of the AMC 14 refunded the price of the tickets

without refunding the service fee charged from ordering the tickets online and told them both to

leave. When Jennifer Reinoehl looked at the AMC mask policy online, there were no exemptions

for people with disabilities in it.

210.   On or about October 13, 2020, Jennifer Reinoehl tried to enter the St. Joseph County

City-County Building in South Bend, IN, without a mask to attend a County Council Meeting.

She informed the police officers at the door about her disability. She was harassed for not

wearing a mask, including being followed to the elevator by a police officer, while he told her

that he "knew" who she was and that he "knew" she always lied to get out of wearing a mask. To

43

the best of her knowledge, Plaintiff had not met this police officer prior to this instance. There were many other people present, and the incident greatly humiliated her.

211.    On or about November 10, 2020, Jennifer Reinoehl again tried to attend a meeting at the City-County Building and again was harassed by police officers even though she informed them of her disability. She was detained from going up to the meeting and as a result unable to sign up prior to the meeting to talk about an important issue not on the docket because she was not permitted upstairs until after the meeting began. She was able to speak about something already on the docket and was thankful she had not been detained long enough to miss that.

212.    While Jennifer Reinoehl was being harassed and detained before being allowed to go to the meeting in ¶211, one of the police officers on duty touched her own mask without washing or sanitizing her hands immediately afterward. This police officer contributed to the spread of disease by doing so.

213.    After the meeting mentioned in ¶211, Jennifer Reinoehl spoke with Councilman Pfeil about the harassment she had undergone. He told her that it was not the Council's fault because the exemption had been added for the medically disabled.

214.    The Plaintiff disagrees with Councilman Pfeil's statement. Consider the ADA itself. When the Courts narrowly interpreted the definition of "disabled person," Congress acted and clarified the Act. When a St. Joseph County Councilman was informed that police officers were not allowing medical exemptions and were harassing anyone not wearing a mask—his response was not to rewrite the order but instead to claim the Council was not liable for the way its order was enforced.

215.    On or about November 27, 2020, Jennifer Reinoehl, in another recorded encounter, was forbidden from entering the Menard Store in Mishawaka, IN, because she could not wear mask

apparel even though she informed the store manager she had a disability and could not wear one. At the time, she was told shopping online was equivalent to shopping in the store, and that was the only accommodation the store was offering for the medically disabled. It is impossible to shop online for Christmas presents when you are not sure what you are going to get someone. You must have a general idea of what you are going to be purchasing in order to enter it into the search bar. Separate benefit that is not as effective is specifically forbidden in 42 US Code § 12182 (b) (1) (a) (iii).

216.    On or about November 27, 2020, Jennifer Reinoehl, in a recorded encounter, was forbidden from entering Sephora because she could not wear a mask even though she informed the employee at the door that she had a disability and could not wear a mask.

217.    On or about November 27, 2020, Jennifer Reinoehl, while shopping in the Christmas Tree Store located in Mishawaka, Indiana, was stopped for not wearing a mask and detained until she could show both the employee and her manager her inhaler as proof of her disability.

218.    On or about December 11, 2020, Jennifer Reinoehl filed a document for a lawsuit not related to this one at the Mishawaka County Courthouse and was prevented from entering it by the police officers on duty until she wore mask apparel even after she told them about her disability. In order to practice her first amendment right, she had to put her life at risk and put on mask apparel. If the police officers, who work for the government, believed the recommendations and mandates require them to prohibit entry of those not wearing masks or harass them on entry, then the exemptions in the recommendations and mandates, as written, mean nothing.

219.    There is a plastic barrier separating the Court Clerk from Jennifer Reinoehl and others who wish to file documents at the Mishawaka County Courthouse.

45

220.    On or about December 14, 2020, Plaintiff called Lt. Steven E. Shively to discuss that his police officers prevented her from entering the Mishawaka County Courthouse unless she put on mask apparel and risk her life as described in ¶217. He allowed Jennifer Reinoehl to record the conversation and initially answered questions, but when asked if he was choosing to follow a County Council mandate over the American Disability Act, he referred Jennifer Reinoehl to the Department's Attorney. The Police Department's Attorney never responded to Jennifer Reinoehl's attempts to contact him.

221.    On or about December 15, 2020, Jennifer Reinoehl again had to enter the Mishawaka County Courthouse in regard to the lawsuit she had filed. The police officers were welcoming and allowed her to enter without harassment after the conversation she had with Lt. Steven E. Shively. However, while depositing materials with the Court Clerk, one of the Court Clerk office employees harassed her for not wearing a mask. This employee was walking in the public area from the restroom back to her office *without a mask on*, but still harassed Jennifer Reinoehl about not wearing one, even though Plaintiff moved to maintain 6 feet of distance between herself and the Clerk's office employee at all times.

222.    Jennifer Reinoehl should not have to call police departments and record conversations and attempt to contact police department attorneys in order to gain access to buildings and to practice her first amendment rights to file a lawsuit.

223.    In the presence of her husband, Jason Reinoehl, Jennifer Reinoehl was exiting Martins Supermarkets on Adams Road in Granger, IN, and a woman who was wearing a mask moved further away from her into a corner by the carts and cowered as Jennifer Reinoehl walked past even though Jennifer Reinoehl was maintaining a 6-foot distance from the woman prior to the woman's actions. Jason Reinoehl was wearing a mask at this time.

46

224.    Jennifer Reinoehl has been discriminated against because of her disability and the mask mandates. She has been given threatening looks by fellow shoppers on multiple occasions, been told she should be forced to wear a mask even if she does have a disability, and has had children cower in fear behind their parents upon seeing her unmasked face. Other shoppers react this way to her even though she maintains 6 feet of distance between herself and others as long as they do not deliberately approach her and purposefully invade the 6-foot space in such a way that she cannot maintain that distance.

225.    On or about January 5, 2021, Plaintiff's father, H.W., an older individual with multiple pre-existing conditions, was admitted to the hospital with COVID-19. Prior to contracting COVID-19, Plaintiff's father faithfully wore non-medical masks when outside his home and avoided all public areas as much as possible. The mask did not stop him from getting COVID-19.

226.    On or about January 29, 2021, Jennifer Reinoehl went to Whole Foods in Mishawaka, IN. At the door she was stopped and detained because she was not wearing a mask. She explained she had a medical disability and could not wear a mask. After about five minutes of waiting in the entry where it was difficult to maintain (6) feet of distance between her and other entering customers, a manager appeared and took her temperature before allowing her into the store. At the time, the entry also contained a table filled with masks, was separated into "in" and "out" sections and had two store employees in it who were screening other entrants. Once she was allowed into the store, Plaintiff easily maintained 6 feet distance from other shoppers in the store while shopping. Since she was never barred from entering Whole Foods completely, it is not a Defendant in this case, but the incident is an example of the extreme harassment Plaintiff has

been subject to as the result of the CDC's recommendations, and Indiana State and local government mandates.

227.   On or about February 14, 2021, Jennifer Reinoehl and her husband went out to eat at Carrabba's Italian Grill in Mishawaka, IN. After being questioned about not wearing a mask and after Jennifer Reinoehl told them she had a disability and could not wear one, they were told they must wait outside in 12° F weather until a table was ready. Jennifer Reinoehl and her husband chose to eat elsewhere. Jennifer Reinoehl and her husband returned to Carrabba's Italian Grill on a later date, were led to a table and waited for over an hour before they were served. Others who came into the restaurant after them received their food and left before a waitress ever returned to their table. Since they were eventually served and the management paid for their meal and since when they returned a third time they experienced no discrimination, Carrabba's is not listed as a Defendant, but the incident is listed to demonstrate the discrimination Plaintiff faced as a direct and proximate result of Government Defendant mask mandates, policies, orders, and recommendations.

228.   On or about March 10, 2021, Jennifer Reinoehl's daughter, S.A., called the Indianapolis Children's Museum to see if they allowed people with disabilities to be exempt from wearing masks. S.A. was told disabled people were not exempt from their policy and would not be allowed in the museum without a mask. Jennifer Reinoehl had wanted to take her children to the Indianapolis Children's Museum for several months but did not see an exemption for those with face masks listed on its website and did not want to suffer the emotional pain of being turned away because she cannot wear a mask. The phone call confirmed that is exactly what would have happened had she attempted to visit.

229.    On or about March 12, 2021, Jennifer Reinoehl went to the Indianapolis Court of the
Appeals Clerk to file an appeal in the unrelated lawsuit previously mentioned. She was allowed
into the building without a mask after telling the police officers she had a disability, but was
prohibited by the Appellate Clerk from filing the appeal unless she wore a mask. There is a thick
glass barrier between the employees of the Clerk's office and those filing the appeal that would
prevent any virus particles from contacting those inside the Clerk's office whether visitors wore
a mask or not. Jennifer Reinoehl suffered an asthma attack while wearing the mask to file her
appeal.

230.    On or about March 19, 2021, S.R., a relative of Plaintiff, needed to get an X-ray at Main
Street Medical Group. He asked Plaintiff to attend with him. Plaintiff went in a corner of the
waiting room with S.R., much more than 6 feet away from either of the other two occupants of
the room, and sat down.

231.    A Beacon employee approached her in the waiting room and told her she could not wait
in the secluded corner of the waiting room but had to wait out in the busy hallway because
Jennifer Reinoehl could not wear a mask. In addition to other medical problems, Plaintiff has
damage to her knee cartilage, which makes sitting down and getting up painful. Getting out of
her seat caused her pain.

232.    In the hallway, she waited on a hard chair where at least eleven other people passed by
her, including one person on her phone who almost ran into Jennifer Reinoehl. Plaintiff was
exposed to many more bacteria and viruses than she would have been in the secluded waiting
room. The chair was uncomfortable, and she could not remain seated in it the entire time. If
Plaintiff had been sick, she would have exposed many more people to disease in the hallway than
what she would have in the corner of the almost empty waiting room. Plaintiff has a video

showing the setup of the hallway and the seclusion and comfort of the waiting room. The hallway accommodations were not equal to the waiting room.

233.    On or about April 9, 2021, Jennifer Reinoehl and her husband witnessed people walking into Menards without masks and so believed she would finally be allowed in the store. She was. After shopping for an entire hour in the store without a mask on, as her and her family were getting into the checkout line, the store manager walked over to them and told them they could not make their purchases unless Jennifer Reinoehl put on a mask even though she told the manager she could not wear a mask because of a disability.

234.    On or about April 23, 2021, Jennifer Reinoehl had to rush her 5-year old daughter to Memorial Hospital because of a tooth abscess. She showed the nurses her doctor's note and was allowed to stay in the hospital with her daughter without a mask for the entire weekend.

235.    When her daughter was released, April 25, 2021, she was told by the nurse to take their baggage down to the car, pull the car up to the door of the hospital, and then return and to get her daughter and check her out. When she attempted to re-enter the hospital to retrieve her daughter after retrieving her car, she was stopped by a security guard. She informed him of her disability, told him she had been in the hospital with her daughter and was just picking her up to take her home, and she showed him her doctor's note from her doctor verifying she could not wear a mask.

236.    The doctor's note is written on letterhead with the doctor's address and identifying information on it similar to a prescription.

237.    At the time, she was also visibly wearing the bracelet given to her by the hospital to confirm she was staying with her daughter and to give her access to the children's ward.

50

238.    The security officer suggested the note was fake and would not let her re-enter the

hospital to get her daughter. Jennifer Reinoehl was in tears, worried about how she was going to

get her daughter and worried about how afraid her daughter would be when she did not return.

239.    Jennifer Reinoehl's daughter was eventually brought down by a nurse after about 20

minutes or more had passed. Plaintiff's young daughter was also traumatized by the event

because Jennifer Reinoehl, unaware she would have any problems, had told her daughter to wait

for her in her bed in the hospital room and not get out until she returned. Plaintiff had also

informed her daughter she would only be gone about ten minutes. Jennifer Reinoehl's 5-year old

daughter thought she was being kidnapped by the nurse and would never see her mother again.

Further, although Jennifer Reinoehl would have maintained 6 feet of distance walking through

the hospital and have encountered few people, by keeping her in the front entryway at least three

other family groups passed within 6 feet of her on their way into the hospital as she was

detained. Jennifer Reinoehl reported the incident to the hospital.

240.    When Jennifer Reinoehl takes any of her children to see their doctor at Main Street

Medical Group, in Mishawaka, IN, which is owned by Beacon, she is frequently harassed by

front desk staff for not wearing mask apparel. One receptionist stated within Plaintiff's hearing

to another receptionist, "She won't wear a mask" instead of "She can't wear a mask."

241.    The receptionists have seen Jennifer Reinoehl's doctor's note and/or inhaler on numerous

occasions.

242.    Even after showing the note, Jennifer Reinoehl has been barred from progressing further

into the doctor's office for business matters. She has been forced to discuss private billing

matters concerning her 5-year old in the public waiting room because she was not allowed to go

back to the business manager's office without a mask. Again, Beacon's policies keep Jennifer

Reinoehl in places of higher traffic instead of allowing her to go to places of lower traffic in its

buildings. Its policies target all disabled persons attempting to get medical care for themselves or

their loved ones.

243.    Beacon staff consistently harass the disabled, not just Plaintiff. Jennifer Reinoehl was not

allowed to go back with S.R. to a lab appointment even though he wanted her to be present. At

the lab appointment he, an adult, was chastised for his behavior and asked how old he was. S.R.

currently needs lab work, but Jennifer Reinoehl has not been able to convince him to return since

he was harassed last time and knows he would have to go by himself.

244.    On or about June 7, 2021, Jennifer Reinoehl again had to put on a mask to file a corrected

brief at the Indiana Court of Appeals Clerk's Office. Again, she had an asthma attack during and

after this event.

245.    On or about the evening of July 5, 2021, Jennifer Reinoehl took S.R. to Beacon's

Granger Hospital. S.R, who has bipolar disorder, had asked Plaintiff to be present with him

because he did not feel as if he could make medical decisions on his own at the time. He had not

taken his medication appropriately that day because he was feeling ill.

246.    When she first arrived with S.R., who was wearing a mask, they were both prohibited

from entering because she was not wearing a mask. The intercom was broken, and she could not

hear the receptionist, but she tried to show the medical note from her doctor through the glass.

After being finally allowed to enter, Plaintiff was told she had to put on mask because Beacon

"*does not accept medical exemptions*" [emphasis added].

247.    Although Jennifer Reinoehl again put her life at risk and donned a mask, the nurse then

called a security guard to the front desk upon hearing Jennifer Reinoehl was not S.R.'s legal

guardian. Once the guard was there, the nurse then told Jennifer Reinoehl it was against hospital

policy to allow any visitors with the patient so the Plaintiff had to leave. She told the Plaintiff this in front of the security guard, further humiliating the Plaintiff.

248. Jennifer Reinoehl informed both of them that she had been asked to be present because S.R. did not feel he could make medical decisions on his own at the time. Plaintiff still had to leave.

249. Plaintiff did not physically attack or attempt to physically attack—nor would she physically attack those who bar her entrance, humiliate, or harass her. In this case, Plaintiff complied and put on a mask without further argument once the policy was explained even though Plaintiff knew she was risking her life by doing so.

250. In return for her compliance, she was further humiliated.

251. Once Plaintiff left the hospital, Plaintiff then had to wait in the car in about 80° F degree weather for over (2) hours. She was thankful the sun had gone down. S.R. was diagnosed with a "respiratory virus" and sent back to work the next day based on what he heard the doctor tell him. If Plaintiff had been present and the doctor said S.R. could return to work with a "respiratory virus," she would have questioned the doctor about it since respiratory viruses, including but not limited to COVID-19, are contagious. Although S.R. tested negative for COVID-19, he had had his symptoms for over a week before going to the hospital. Rapid COVID-19 tests are poor at detecting COVID-19 when tests are given more than a week after symptoms appear.

252. Plaintiff, Jennifer Reinoehl, has been harassed, stigmatized, and barred from entering many places of public accommodation because of her disability, which does not allow her to wear mask apparel.

253. Plaintiff suffered emotional pain and suffering when she was not allowed to enter public accommodations and when she is and was treated like an outcast simply because wearing mask apparel is dangerous for her.

254. Plaintiff has had to put her life at risk and wear a mask in order to practice her first amendment right to file a lawsuit.

## IV.  **ARGUMENT**

255. Mask apparel does not, has not, and cannot prevent the spread of COVID-19.

256. Mask mandates "mark" the disabled who cannot wear a mask—they must wear a mask and risk their health or stand out from everyone else without wearing them.

257. Jennifer Reinoehl meets the ADA definition of disabled because of her breathing and heart issues, among other things. Jennifer Reinoehl first told the people barring her from entry that she was disabled. If they continued to refuse her admittance, she would show her inhaler to prove she was disabled or show them the note from her doctor, despite the ADA and HIPPA prohibiting businesses from requiring such documentation. Even after showing her doctor's note, she still has not been allowed to access places, including the Indiana Appellate Court and Beacon, without wearing a mask and putting her life at risk.

258. On July 24, 2021, Governor Eric J. Holcomb issued Executive Order 20-37, mandating facial coverings. At that time, the Executive Order noted there had been "more than 60,000 sickened" in the entire state of Indiana since the beginning of the emergency.

259. Indiana is a state with more than 6 million residents. In (4) months-time, fewer than 1/100% of the state population had contracted COVID-19 at the time of the mask mandate. Cases dramatically rose in Indiana between September 29, 2020 and December 9, 2020 despite mask mandates being firmly in place and more than 70% compliance with the mandates. According to

the Indiana Dashboard, Indiana has had about 803,403 positive cases of COVID-19 since March 6, 2020 (less than 13.4% of the total population) and 13,714 deaths (about 0.2% of the population) in about 16 months.

260.    In a matter of *weeks* during the Spanish flu, about 25% of the population of Camp Grant had come down with Spanish flu and about 2.5% had died. Spanish flu was the only time in American history prior to COVID-19 when masks were mandated for use by the general population across the nation as a preventative.

261.    Executive Order 20-37 noted that 2,600 had died, which gave COVID-19 a 4.3% case-fatality rate (it has since declined to a 1.8% fatality rate in Indiana). The 2017-2018 flu had a 9% case fatality rate, despite vaccine availability, and mask mandates were not enacted or even considered by any government entity during that pandemic. At this point, the math would have shown Governor Eric J. Holcomb that COVID-19 was not deadly like the flu nor was it as contagious.

262.    For comparison, during the 2017-2018 flu pandemic which primarily occurred over 3 months, an estimated 45 million people across the United States got sick with influenza in 12 months. In about 17 months, an estimated 33.7 million people have gotten sick with COVID-19.

263.    Governor Eric J. Holcomb stated in his Executive Orders that he declared the emergency in Indiana because, among other things, (1) WHO declared COVID-19 to be a pandemic and (2) President Trump declared a national emergency. During the 2008-2009 H1N1 flu season, (1) WHO declared H1N1 to be a pandemic and (2) President Obama declared a national emergency. Governor Mitch Daniels did not use his emergency powers to declare a state emergency. The case fatality for the 2008-2009 H1N1 pandemic was 6.1-7.9% even though people had been

vaccinated for flu that year, making it more than twice as deadly as the current case fatality rates for COVID-19.

264.    Despite the pandemic and national emergency declarations, the 2008-2009 H1N1 flu season was mild compared to the 2017-2018 flu season. Several members in the scientific community raised the alarm that the pandemic and panic around 2008-2009 H1N1 had been caused by private, for-profit companies influencing WHO decisions and declarations, including pressuring WHO to redefine the term "pandemic" and make it easier for one to be declared.

265.    The British Medical Journal investigated and discovered for-profit companies had influenced WHO.[1] WHO has not changed its all-encompassing definition of pandemic. Since WHO decisions to declare pandemics can be motivated by for-profit interest groups, their declaration of a pandemic is not an acceptable reason to enact any public health measure that denies people of their rights.

266.    COVID-19 has been promoted as a "new" disease, just as H1N1 had been promoted as a "new" flu. By the time the first case appeared in Indiana, COVID-19 had been genetically sequenced and was found to be about 27,000 base pairs long. Only about 270 of those base pairs were different from SARS. Because SARS and COVID-19 are so similar, not only would they be considered the same species if viral species were universally accepted, but they are so close they have been named almost identically: SARS-CoV and SARS-CoV-2.

267.    The closer one virus is genetically to another virus, the more likely it is to behave in a similar way.

268.    COVID-19 has been much milder than the 2008-2009 H1N1 flu. Private, for-profit companies have made billions off of masks, medications, and vaccines without having to spend money completing safety and effectiveness trials because of "Emergency Use Authorization."

---

[1] *BMJ* 2010; 340 doi: https://doi.org/10.1136/bmj.c2947 (Published 04 June 2010)

The U.S. disposable face mask market jumped from less than $140 million in 2019 to more than $90 *billion* in 2020 with half that revenue from non-medical masks.[2]

269.    State and local governments should never be allowed to mandate these medical interventions without statistically proven benefit because all medical interventions come with medical risks.

270.    In this case, masks mandates not only put Jennifer Reinoehl's life in danger when she wears them by causing among other things asthma attacks, increased heart rate, and low blood oxygen levels, but also subject Jennifer Reinoehl to harassment and discrimination when she does not because of state propaganda campaigns that rely on psychological manipulation and emotions instead of relying on science.

271.    Further, although the scientific community and WHO were both open to criticism during the 2008-2009 H1N1 flu pandemic, voices critical of the COVID-19 pandemic and its policies are being stifled.

272.    Good scientific theories can easily stand up to criticism because they are based on direct evidence from randomized controlled trials. There is no direct evidence in the form of large randomized controlled trials supporting the experimental policies, mandates, and recommendations for COVID-19 despite the fact it has been almost 2 years since its first discovery. Because of this, if the government encouraged public debates among scientists about the current policies, mandates, and recommendations, they would not stand up to scientific scrutiny.

273.    As of July 6, 2021, the State of Indiana's COVID-19 dashboard shows that new case incidences varied throughout the seasons regardless of mask mandates. COVID-19 daily new case numbers are following the same seasonal highs and lows as last year.[3]

---

[2] https://www.kbvresearch.com/disposable-face-masks-market/

274.    Across all states with mask mandates, including Indiana, case-fatality rates of COVID-19 were significantly higher than those of states that never enacted mask mandates, using a two-tailed statistical analysis test. For example, as of July 6, 2021, the case-fatality rate (or chance you will die if you get COVID-19) is 1.83% in Indiana. The case-fatality rate for Florida, which never enacted mask mandates and is a state more than three times larger than Indiana in population that contains a greater proportion of at-risk, elderly individuals, is 1.62%. You were 12% less likely to die if you contracted COVID-19 in Florida where they did not have a state-wide mask mandate as opposed to if you contracted COVID-19 in Indiana where there was a state-wide mask mandate based on the numbers as published.

275.    The police power afforded to governments to reasonably address public health and safety issues is not limitless. The Government Defendants continue to renew their emergency powers for COVID-19 without a clear termination point, despite the requirement of emergencies to have one. Within 4 months of Governor Eric J. Holcomb issuing Executive Order 20-02, there was solid scientific evidence that schools were not places of massive transmission, children were more likely to die from flu than from COVID-19, pandemic flu of 2017-2018 was more deadly than COVID-19, and those who died from COVID-19 had multiple co-morbidities that could have been factors in their deaths. The "emergency" should have been over at that point, but it has continued to be renewed solely on the natural seasonal highs and lows that occur with most communicable diseases.

276.    The rights secured by the United States Constitution do not disappear during a public health crisis—especially when those who determine if there is a public health crisis are the same people and agencies who can exercise tyrannical, rights-suppressing power.

**A. Jacobson v. Massachusetts**

---

[3] https://www.coronavirus.in.gov/2393.htm

277.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), in which the Supreme Court ruled that it was acceptable for Massachusetts to mandate all healthy citizens take a smallpox vaccination or be fined a one-time fee of $5 (about $150 adjusted for today), is frequently used to support State police power in the face of public health emergencies, among other things.

278.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), does not apply in this situation.

279.    In *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) the vaccination offered was not required to enter businesses in the state. Since Jacobson and other residents of the state were not required to offer proof of vaccination to obtain services or access to businesses within the state and since even healthy individuals could refuse the vaccination and pay a small fine, as Jacobson did after the ruling, the police power being exercised by government officials who have created mask mandates during COVID-19 is vastly greater than the police power exercised in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). During COVID-19, citizens have no option to pay a small fine to get out of the mask mandate. In addition, they are being prevented from accessing public accommodation if they do not or cannot wear masks.

280.    The Court held in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) that Jacobson had the appearance of a healthy man and had not provided admittable evidence to the contrary. Adults could obtain exemption from vaccination *and* from paying the fine if they presented a doctor's exemption. Not only has the government failed to allow healthy citizens an alternative, small one-time fine to wearing masks, but also the government has failed to enact the mandates in such a way that businesses and government agencies *must* exempt those with medical problems from wearing masks.

281.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because the Court

noted that Jacobson offered no material evidence into the case, including but not limited to

scientific evidence in opposition to vaccination or medical evidence of his health problems.

282.    Plaintiff in this case already has historical and scientific evidence showing mask apparel

does not prevent disease transmission and can cause health problems (including but not limited

to Exhibits 1-29).

283.    In addition, Plaintiff is willing to submit her medical records, including her doctor's note

which describes her medical condition and reason for exemption, to the court during Discovery.

284.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because it was

predicated on the *centuries* of scientific evidence showing the safety and effectiveness of the

smallpox vaccine.

285.    The evidence available to Defendants about the smallpox vaccine in *Jacobson v.*

*Massachusetts*, 197 U.S. 11 (1905) specifically included, but is not limited to: (a) The first

statistics on case-fatality rates between the smallpox disease and variolation (the precursor to

vaccination) were collected during the Boston smallpox plague in 1721 and showed a reduction

in death for those variolated; (b) When Jenner discovered the safer cowpox/horsepox virus also

provided protection in 1796, vaccination became widespread; (c) Based on the evidence the

smallpox vaccine got the support of President Madison, who signed "An Act to

Encourage Vaccination" in 1813. (d) There were more than 200 years of scientific evidence

supporting the scientific safety and effectiveness of smallpox's variolation and vaccination

methods prior 1905, and (e) in 1905, smallpox vaccination was a scientifically and medically

accepted method of preventing smallpox and had been for almost a century.

286.    In contrast, (a) scientists today are divided in peer-reviewed literature on the safety and

effectiveness of *any* mask used by the general public to prevent disease transmission, despite

their hundreds of years of use and the development of N-95 masks which can theoretically filter

95% of all viral particles. (b) Cloth masks and facial coverings failed to prevent the spread of

Spanish Flu. (Exhibit 8, 9) (c) Wearing any mask comes with health risks to all the people who

wear them. (Exhibit 21-29) (d) The ineffectiveness of cloth masks and facial coverings to

prevent disease transmission has kept them out of U.S. hospitals since the 1970s. (e) Direct

evidence from at least one randomized controlled trial of cloth masks showed they were

ineffective at preventing the spread of the Spanish flu. (f) "Non-medical" melt-blown masks,

confusingly designed to look identical to surgical masks, have never been tested for safety and

effectiveness and are entirely experimental in nature since they did not exist prior to 2020.

Unlike the smallpox vaccine, where entire cities had been monitored, there have been no

randomized controlled trials on "non-medical" melt-blown masks, and therefore there is no

direct evidence about them. (g) In order for mask apparel to be available in the United States, the

FDA required that manufacturers do not place anything on their labels that would mislead

consumers into believing they can prevent disease transmission. (Exhibit 16,17) (f) The evidence

*against* mask apparel effectiveness is stronger than the evidence for it.

287.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because smallpox is a

much deadlier disease than COVID-19.

288.    Smallpox is a disease with an average 30% case-fatality rate across all age groups.

Among those vaccinated who then acquired the disease, case-fatality rates ranged from 1.3%-

11% (something the Court of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) could have

accessed). The vaccine itself had a case-fatality of 0.0002%. Smallpox affects young and old alike.

289.    Without vaccination, COVID-19 is a disease with a case-fatality rate of 1.7% in the United States (1.8% in Indiana) calculated based on statistics reported by Google from the New York Times January 9, 2021, making it more than 11 times less deadly than smallpox in unvaccinated individuals and less deadly than smallpox was in many vaccinated individuals. In addition, COVID-19 primarily kills people over the age of 65 who have multiple comorbidities. Randomized controlled Phase 3 and 4 trials producing statistically significant direct evidence data have not occurred for mask apparel so it is impossible to know for certain if the COVID-19 case-fatality rate is smaller or greater for people who wear mask apparel or if the mask apparel itself can kill people, especially disabled people such as the Plaintiff.

290.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because in it, the government had not written laws in such a way that would allow businesses to bar people from entering if they had not been vaccinated—nor could the law have been interpreted by the businesses to take such action on their own through their own policies.

291.    In the case of mask mandates, not only are the mandates and recommendations written in such a way as to allow private businesses to police citizens, but also, they allow these private businesses to create their own, harsher policies.

292.    In *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), Jacobson paid a small fine and did not have to ever be vaccinated. Today, if a person chooses to refuse the government or store mandate requiring him or her to wear a mask, he or she cannot enter public accommodations, shop for food, enter a post office, file a lawsuit, or numerous other activities necessary for life.

293.    In 1905, when there was no other method of treating smallpox or preventing its spread *and* when vaccination was shown by more than 200 years of research to be safe and effective at preventing its transmission, when smallpox killed about 1 of every 3 people it infected, *and* when the majority of the members of the medical and scientific community supported vaccination, freely vaccinating healthy people by mandate or requiring them to pay a fine that would be the equivalent of about $150 today was reasonable, when not being vaccinated did not effect Jacobson's ability to enter public accommodation, the Court did not err in its opinion under those conditions in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).

294.    In 2021, when there are many methods of treatment for COVID-19, when there are many methods of preventing its transmission that are supported by the majority of the scientific community (some of which have not been executed or have been poorly executed in their entirety by the CDC, the State of Indiana and its governing bodies and health departments listed as Defendants), when other methods do not infringe Constitutional Rights, when COVID-19 is not a deadly disease in comparison to many other diseases, when the safety and effectiveness of mask apparel has not yet been investigated in the scientific community through randomized controlled trials providing direct evidence, when the data we do have published in peer review journals and published by the U.S. military shows mask apparel to be ineffective, when healthy people are not offered the option of paying a small fine (i.e. $150) to get out of wearing a mask, when the government agencies are not ensuring disabled people who cannot wear masks are allowed entry to businesses, and when the FDA is refusing to regulate non-medical masks for safety and effectiveness, a mask mandate is unreasonable, arbitrary, and unwarranted.

295.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because in it, the Court stated, "Although this court has refrained frained [sic] from any attempt to define the

63

limits of that power, yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate *to matters completely within its territory and which do not by their necessary operation affect the people of other states,*" [emphasis added]. Mandating masks in order to enter any business or public space within the state of Indiana affects the people of other states, including visitors coming from other states that do not have mask mandates in place.

296.    In the case of mandated masks, references more appropriate than *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) would include but not be limited to the cited *Gibbons v. Ogden,* 22 U.S. 9 Wheat. 1 1 (1824).

297.    The ruling in *Gibbons v. Ogden,* 22 U.S. 9 Wheat. 1 1 (1824) (the state sought to preserve its waterways solely for its residents) supports Plaintiff's claims—a state cannot regulate public waterways (or in this case public accommodations) in a way that prevents or inhibits citizens of other states from using them or prevents citizens from other states from conducting commerce in that state. Mandated masks interfere with the rights of citizens of other states.

298.    *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) does not apply here because in 1905, the U.S. military, including the now Federally funded National Guard, could not have been called in to quickly build field hospitals that could care for the sick, as they were called in to do at the beginning of the COVID-19 pandemic in New York. (Exhibit 33)

299.    Federal and state leaders have used the excuse they would "run out of hospital beds" as a justification for ignoring Constitutional Rights and exercising unlimited police power since March 17, 2020, when Ferguson, et al.'s now discarded model was first introduced with that claim.

64

300.    President Trump quickly authorized additional military hospitals in response to the claim

we would "run out of hospital beds," including a fully operational and almost instantly available

1000 bed Navy medical ship in New York. These military hospitals in New York were used by

only a few people and in some cases were not used at all before being taken down around May 1,

2020, because they were deemed unnecessary and because they were costing taxpayers money

without being used. (Exhibits 33, 34)

301.    Since the Navy's well-researched report on Spanish Flu in 1919 stated the *only* thing a

government could do to stem deaths during a pandemic was "build more hospitals," this should

be an important medical recourse for any government, especially since it does not interfere with

Constitutional Rights. (Exhibit 8) Quickly erected military field hospitals provide ideal

containment facilities for sick who test positive for COVID-19. These would keep COVID-19

positive people away from other sick people who do not have the disease, supporting isolation

efforts. Military field hospitals could specialize in COVID-19 treatment to improve the quality of

care for these patients, reducing case-fatality rates, and potentially reducing personal protective

equipment demands. Field hospitals could treat on an in-patient basis both the seriously ill and

the mildly ill, which would help isolate COVID-19 patients with mild but active symptoms and

prevent them from spreading the disease in the community. The FMLA gives sick workers the

ability to stay home (or in a field hospital) without fear of being fired, making containment and

isolation easier and less restrictive on Constitutional Rights than mandating mask apparel for the

healthy. Contained COVID-19 treatment facilities would have allowed hospitals and other

medical services to continue operating as normal and reduce fatalities caused when

"unnecessary" medical services are randomly prohibited or delayed by government officials'

unscientific methods of controlling the pandemic.

65

302.     During the COVID-19 pandemic, the ability of States, including but not limited to the

State of Indiana, to build field hospitals has gone virtually unused, while Federal and State

officials, including but not limited to those listed as Defendants, continue to claim we will "run

out of hospital beds" if emergency mask apparel mandates are not followed and if Constitutional

Rights of healthy individuals are not set aside. Instead of using the COVID-19 field hospitals

built for it, the city of New York decided to send over 9,000 patients to nursing homes where

they could further spread the disease.

303.     Failing to use options that would not violate Constitutional Rights in favor of ones that

trample them is an abuse of power that must not go unchecked—and which had not occurred in

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905).

304.     *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because most people

at the time, including medical workers, were not aware of the importance of hand washing and

covering coughs to prevent disease transmission. The existence of viruses was debated as were

most methods of disease control. Antibiotics to treat secondary conditions such as bacterial

pneumonia were still undiscovered. Although every vaccine that had been invented did not work,

there were at least (7) vaccines, including the smallpox vaccine, available for different diseases

at the time and their effectiveness was not debated. Vaccines were the only known preventative

that worked in all cities.

305.     Scientists and doctors today know how small the smallpox virus is and how it spreads

from active sneezing, coughing, and close contact, including but not limited to hugging (through

"droplet" spread), or air contamination by viral particles from the infected (through "aerosol"

spread), or spread from articles touched by the victim including but not limited to clothing

(fomite spread). Other now known methods of disease transmission for diseases other than

smallpox include but are not limited to fecal-oral, animal vectors, and sexual transmission. We know, among other things, that hospitals are a major source of disease transmission as are unwashed hands and coughs and sneezes that people do not cover with a hand or elbow.

306.    Plaintiff hopes a detailed list of all the modern disease prevention methods is unnecessary because of its length, but offers as an example some that were incorporated in plans to eradicate smallpox (when vaccination alone did not work) and Guinea worm (for which there is no vaccination): In 1966, the WHO began a smallpox eradication plan. It relied on community education, early identification of cases, early isolation of the sick, and targeted vaccination. The last known worldwide case of smallpox occurred 10 years later, in 1976.

307.    The Guinea worm eradication program consists primarily of educating locals, finding and isolating case outbreaks rapidly, early treatment, and water purification. (Exhibit 35)

308.    Included in both eradication methods was early identification, treatment, and isolation/quarantine of the *sick*. Mass masking of healthy individuals was not a part of the smallpox eradication plan-nor was any other forced mass compliance with health orders. The Government Defendants are not relying on these time-proven methods of disease control that work well without infringing on Rights and instead have turned to tyrannical mask apparel mandates that harm the disabled.

309.    Faith in mask apparel to stop droplets as preached by the Defendants, has led many to stop covering their coughs when masked—thus exchanging a known disease preventative (covering coughs) for an unknown one that was ineffective in previous pandemics. On the contrary, in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) Massachusetts was enacting the most effective method of disease prevention for that time.

310.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because in 1905

powerful disinfectants, including but not limited to quaternary ammonium compounds, had not

yet been discovered. Hand sanitizer and disposable tissues were non-existent. Although cloth

masks were available (and notably not mandated by Cambridge, Massachusetts or even

considered as a method of disease prevention), their effectiveness is and was at the time debated.

311.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because in addition

to knowledge and powerful disinfectants, we have antiviral medications to treat diseases caused

by viruses and antibiotics to treat secondary infections caused by bacteria. We have diagnostic

machines, and the ability to quickly create tests, perform them, and obtain results, including but

not limited to nasal swab tests, which help us pin-point who has the disease and who does not.

Improving the accuracy of the diagnostic tests should be foremost in any government enacted

plan to control disease transmission.

312.    There were no known, effective cleaning methods, diagnostic tests, or treatments for

smallpox in 1905, and vaccination was the only known, effective method of prevention.

313.    Another reason *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here is

because some of the arguments of the Court were founded upon precepts that no longer apply

since many Federal laws have been passed in the past 115 years, which further secure the rights

of citizens. For example, the statement by the Court that

> "The liberty secured by the 14th Amendment, this court has said,
> consists, in part, in the right of a person 'to live and work where he
> will' (*Allgeyer* v. *Louisiana*, 165 U. S. 578, 41 L. ed. 832, 17 Sup.
> Ct. Rep. 427); and yet he may be compelled, by force if need be,
> against his will and without regard to his personal wishes or his
> pecuniary interests, or even his religious or political convictions, to
> take his place in the ranks of the army of his country, and risk the
> chance of being shot down in its defense"

no longer applies since 50 U.S. Code § 456 passed June 24, 1948 allows people to avoid military service or active duty if they are a conscientious objector (a person who, for reasons of conscience, objects to military service).

314.    If in 1905 a man could be forced to take a vaccination on the basis that he could also be compelled to be shot at in the army of his country, then in 2021, since he can no longer be compelled to be shot at in the army of his country by simply declaring reasons of conscience, he also can no longer be compelled to take a vaccination or follow mask mandates as a manner of conscience.

315.    U.S. Const., 14th Amendment § 5 gives Congress the right to legislate States.

316.    Congress in the past 115 years has used that right to strengthen the rights of the people through Acts including but not limited to 50 U.S. Code § 456, the Civil Rights Act of 1964, and the ADA.

317.    Another important difference is that in *Jacobson v. Massachusetts* 197 U.S. 11 (1905), the Court believed those making public health decisions "presumably" had the knowledge to do so.

318.    *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) requires standards before expert testimony is admitted to the Court—these standards determine whether or not someone is an expert in his or her field and should determine whether or not someone "presumably" has the knowledge to make public health decisions as stated in *Jacobson v. Massachusetts* 197 U.S. 11 (1905).

319.    The CDC, Dr. Anthony S. Fauci, the FDA, and the Marion County Health Department, although qualified as experts under the *Daubert* principal, but under 5 U.S. Code § 702 their decisions and publications are subject to judicial review since Jennifer Reinoehl and others

similarly situated have been injured by their actions both directly (including but not limited to being prevented from travelling) and indirectly (including but not limited to being barred from businesses based on their advice), and if the Court rules in the Plaintiff's favor, her injuries will be redressed.

320.    Although the CDC, Dr. Anthony S. Fauci, the FDA, and the Marion County Health Department have published papers in peer-reviewed journals on infectious respiratory diseases, none of the other Defendants have published papers in peer-reviewed journals on infectious respiratory diseases.

321.    Medicine today is not as simple as it was in 1905. It is filled with specialties. A medical doctor who specializes in gynecology, such as Dr. Kristina M. Box, usually spends fourteen weeks or less studying infectious respiratory diseases and their transmission prior to beginning their work and might not have ever studied infectious respiratory diseases, which falls under the specialty of allergies and immunology. Once a person becomes a doctor, he or she may never revisit this topic again even if they studied it briefly in college.

322.    None of the Indiana Government Defendants are doctors specializing in infectious respiratory diseases. Of those who are doctors, Dr. Robert Einterz, Health Officer of the St. Joseph County Health Department, is an internist who focused on adults with HIV, Dr. Mark Fox, Deputy Health Officer of the St. Joseph County Health Department, is a cardiologist who specialized in diseases of the heart and medical ethics, Dr. Kristina M. Box, Indiana State Health Commissioner, is a gynecologist who focused on vaginal diseases and sexually transmitted diseases, Dr. Lydia Mertz, the former head of the Elkhart Health Department, is a bariatric doctor who specializes in obesity; Dr. Bethany Wait, current head of the Elkhart Health Department, is a family medicine practitioner.

70

323.    Although Beacon employs numerous doctors, only two of its top eleven leadership positions are filled by medical doctors: Dr. Sam El-Dalati is a cardiac surgeon and Dr. Vincent Henderson a family medicine practitioner. Similarly, its fourteen-member board has only four medical doctors on it: Dr. Jesse Hsieh is a family medicine practitioner, Dr. Walter Halloran a cardiac surgeon specializing in heart problems, Dr. Samir Patel a diagnostic radiologist specializing in reading medical imaging procedures, and Dr. Gene Grove an anesthesiologist specializing in preventing pain during surgery.

324.    Any infectious disease doctors in Beacon's employ whom Beacon's leadership consults may fear losing their jobs and even their licenses to practice if they speak out against masking, just as the license of Dr. Steven LaTulippe was very publicly suspended for making public statements against masking. Although in the past a second, disagreeing medical opinion was a patient's right to seek, during COVID-19 doctors can lose their ability to earn a living if they do not agree with those around them.

325.    None of the people listed in ¶¶322-323 who are making the final policy and mandate decisions qualify as experts in infectious respiratory diseases under the *Daubert* principal. If they do not qualify as experts, the Court should not "presume" they have the knowledge to make these decisions.

326.    And finally, in *Jacobson v. Massachusetts* 197 U.S. 11 (1905), the Court failed to consider the implications and responsibilities of a government and government agents who can (a) push public messages that masks are not needed, which may or may not drive stocks down, purchase the stocks, and then mandate masks, which will cause the stocks they purchased to skyrocket, and (b) increase government revenue as a whole through taxes and other means by turning a $140 million industry into a $90 billion industry with their emergency powers.

327.   *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) acknowledges,

> "We say necessities of the case, because it might be that an
> acknowledged power of a local community to protect itself against
> an epidemic threatening the safety of all might be exercised in
> particular circumstances and in reference to particular persons in
> such an arbitrary, unreasonable manner, or might go so far beyond
> what was reasonably required for the safety of the public, as to
> authorize or compel the courts to interfere for the protection of
> such persons."

328.   *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) was never meant to be definitive.

329.   *Jacobson v. Massachusetts* 197 U.S. 11 (1905) needs to be revisited on its own merits

well as on the merits of the laws enacted since it was decided and the merits of the improvements

made to healthcare.

**B. Emergency Powers Are Limited**

330.   Emergencies and the powers granted to leaders during them, do not last indefinitely and

have both a beginning and an end. The COVID-19 "state of emergency" was declared over (1)

year ago.

331.   The COVID-19 "emergency" has lasted for over a year. The World Health Organization

defines "state of emergency" as

> "A 'state of emergency' demands to 'be declared' or imposed by
> somebody in authority, who, at a certain moment, will also lift it.
> Thus, it is usually defined in time and space, it requires threshold
> values to be recognized, and it implies rules of engagement and an
> exit strategy"

332.   I.C. § 10-14-3-12 states "All executive orders or proclamations issued under this

subsection must indicate the conditions which have brought the disaster about or that make

possible termination of the state of disaster emergency." COVID-19 is not a good candidate for

eradication and therefore eradication is not a feasible endpoint where the state of emergency

ends. Simply stating that COVID-19 exists is not a reason for declaring an emergency as many diseases exist and most of them are more deadly and more contagious than COVID-19.

333.   I.C. § 10-14-3-1 defines disaster as "an occurrence or immediate threat of widespread or severe damage, injury, or loss of life..." Compared to other diseases, such as the 2017-2018 flu, COVID-19 was not as dangerous or deadly, and by the time mask mandates went into effect this was evident.

334.   There has been adequate time for government officials to stabilize health systems, to implement testing, research, and education, and to create contact tracing procedures.

335.   Early identification through accurate testing, contact tracing, isolating the sick, and increasing the numbers of hospital beds are all scientifically and medically accepted methods of controlling disease that do not greatly infringe on Constitutional Rights.

336.   The Government Defendants did not devote sufficient resources to creating more accurate tests to identify cases earlier nor did they enact sufficient contact tracing methods in Spring of 2020, which were vital at that time to preventing disease transmission. Policies preventing "unnecessary" medical care did not increase hospital beds and medical workers, but decreased them.

337.   Instead of policies that encouraged the sick to seek treatment, persons who tested positive for COVID-19 were treated as if they were zombies from a Hollywood movie—in sync with the CDC's webpage discussing what to do if there is a zombie apocalypse. Unscientific, draconian methods and contradicting statements made people fearful of seeking treatment and distrustful of the government. Putting millions of healthy people out of work for no reason did not improve the situation and gave masses of people more time to interact with each other on more personal levels, which would increase the spread of any disease.

338.    Scientifically supported methods of disease control, such as quarantining the sick, which were specifically referred to in state laws, were ignored during COVID-19. The laws allowing these methods contain pathways for citizens to seek Court redress concerning the quarantine.

339.    Conversely, mask mandates, which were found by the U.S. military and other scientific investigations to be ineffective during the Spanish flu pandemic of the early 19th century, were enacted without offering citizens a method of redress through the Courts and without protecting disabled citizens from discriminatory treatment in violation of State and Federal laws and the Constitution of the United States.

340.    There had been adequate time for government officials to stabilize health systems using the National Guard, implement accurate testing, research effective treatments to reduce fatality, educate the public and policy makers, and establish contact tracing procedures—things a government should do during a public health emergency concerning any infectious disease.

341.    The CDC, FDA, and Dr. Anthony S. Fauci failed to firmly establish accurate testing procedures and clear guidelines necessary to prevent disease spread. The CDC has published conflicting and confusing guidelines that failed to educate the public about the nature of the disease, allowing many infected people to believe COVID-19 would be devastating, so their own symptoms were only a cold. These people spread COVID-19 without being tested. The CDC enacted experimental mask mandates that contributed to the spread because the general population and officials did not wear masks correctly as documented in numerous public interviews and photographs.

342.    Definitively ending non-medical mask and lock down mandates, allowing people to return to their work without fear that it will be soon shut down again, clearly, honestly, and conclusively explaining medical policies that restrict as few rights as possible, treatment options,

74

vaccination options, and best practices for prevention to the public in a non-threatening, consistent way that is not psychologically manipulative, and increasing medical treatment facilities and personnel if needed through the National Guard, would have helped citizens feel reassured and less fearful, reduced riots (based on more than 1000 years of police power and pandemic history), and encouraged people to seek medical treatment and submit to isolation when sick. None of these proven methods of disease control were enacted by Government Defendants and most are still not being enacted.

343. The government representatives and agencies who determine if there is or is not a public health emergency also determine what public health measures will be mandated, therefore the actions they are allowed to take under "emergency" situations must be limited in order to preserve Constitutional rights and prevent tyranny. Without limitation, a governor or government council could declare the common cold to be a national emergency and enact laws that mandate everyone wear belts of vitamin C tablets around their waists. By declaring COVID-19, which is a common cold with a lower case-fatality rate than 2017-2018 flu, to be a public emergency and by mandating citizens wear mask apparel during the emergency and continuing the "emergency" indefinitely, public officials have acted just as ridiculously and continued to maintain their tyrannical power by continuing to renew emergency declarations. These mandates could be reenacted at any point in time for any future disease, or even in the case of COVID-19 "variants," regardless of low fatality rates, regardless of the outlash they cause against disabled citizens, regardless of the ineffectiveness of the mandates at controlling disease transmission, and regardless of the public health problems they create.

344. The Defendants poor response to the COVID-19 pandemic, which including requiring everyone to wear masks when they knew masks could spread disease and which ignored long-

standing methods of disease control has increased the number of citizens who contracted COVID-19.

345.     The Government Defendants' mask mandates, orders, policies, and recommendations need to be reviewed because they have failed to prevent the transmission of COVID-19 and have trampled many Constitutional Rights.

**C. Abuse of Police Power**

346.     The ADA requires people with disabilities of all kinds to have equal access to public accommodation.

347.     All Defendants have infringed upon the ADA by not considering the accommodations needed by its disabled citizens and disabled visitors to the State. They have enacted discriminatory policies, recommendations, orders, and mandates where "exemptions," if they exist, can be ignored.

348.     Remaining 6 feet apart—a safe, easy accommodation for disabled people, as well as one for those wishing to exercise their freedom of speech, those wishing to exercise their right to protest, those wishing to freely practice their right to file a lawsuit, and those wishing to freely practice their religion—prevents the spread of COVID-19 and does not infringe on the rights of citizens.

349.     Police power and sovereign immunity is not extended to private entities not in government employ—even during emergencies.

350.     Businesses should never be allowed to determine who can and cannot enter their doors. As shown during pre-1954 eras and here, they prefer enacting discriminatory policies. If businesses are allowed to enact policies preventing those with disabilities from entering on grounds they are doing so to "prevent disease," they will continue to make policies that

76

discriminate. For example, after the mask mandate was lifted in Indiana, Menard, Inc., continued to discriminate against its disabled customers. Menard, Inc. would not allow Jennifer Reinoehl to make a purchase after she had been allowed to walk around the store without a mask for over an hour. That policy has nothing to do with public health and everything to do with discrimination against the disabled.

351. Further, Menard, Inc. was warned by the Attorney General of Michigan because they were price gouging masks in March 2020. After being warned about this, Menard enacted its mask policy and began selling masks at its front door to those without them for $1 each. Profit— not health—drove Menard, Inc. and other similar businesses to pursue mask mandates.

352. Businesses base their policies on public relations, profit, and news reports instead of scientifically sound data. Menard, Inc, and Sephora, for example, profited from both the spread of COVID-19 and mask mandates by mandating masks in their stores while at the same time selling masks.

353. Non-medical masks are not approved by the FDA for preventing the spread of any disease. Any and all statements about the effectiveness of non-medical masks in preventing disease transmission that were made by the Defendants violate the FDA's EUA issued April 9, 2020, 18 U.S.C. § 1035, and the Food, Drug and Cosmetics Act among other laws.

354. The Defendants have had more than a year to commission or cause to be commissioned significantly large randomized controlled trials of a variety of masks, including but not limited to several designs of cloth masks, in order to determine through direct evidence their safety and effectiveness in hospital and community settings but have not done so.

355. Government Defendants have not performed any randomized controlled trials to collect direct evidence of mask effectiveness for similar reasons that 3M did not fund studies with a

control: If the studies are conducted, there is a good chance not wearing a mask will be as effective or more effective than wearing one.

356.    Using non-medical devices for medical purposes when they are not regulated by the FDA is experimental and dangerous, and should never be compelled upon a person Title 45 §46.116. (Exhibits 30, 31)

357.    Currently, in *United States v. Grenon* (1:20-mj-03050) the United States is suing individuals who sold a product as a cure for COVID-19 that was not approved by the FDA for the treatment of COVID-19. This is not the first case the United States government has brought against individuals for selling "treatments" and "preventatives" that are not approved by the FDA for treating or preventing disease.

358.    Although the Defendants did not manufacture non-medical masks or distribute them, in *Bolger v. Amazon.com, LLC*, 53 Cal. App. 5th 431, 447–62, 267 Cal. Rptr. 3d 601, 612–25 (2020), the Court ruled against Amazon stating that "Whatever term we use to describe Amazon's role, be it 'retailer,' 'distributor,' or merely 'facilitator,' it was pivotal in bringing the product here to the consumer."

359.    All the Defendants are pivotal in bringing mask products to the customer by encouraging others to wear masks, mandating others to wear masks, and by offering masks for sale that are not being regulated by the FDA for extended periods of time and which have not undergone effectiveness and safety trials, including trials assessing safety for those with breathing disabilities and the dangers they may present when worn for long periods of time.

360.    *Wilmont v. City of S. Bend*, 48 N.E.2d 649, 650 (1943) gave courts the power to confine government administrative agencies to their lawful jurisdictions in Indiana.

361. The United States Constitution gives citizens equal treatment and equal protection under the law.

362. Governor Eric J. Holcomb and Dr. Kristina M. Box destabilized Indiana heath systems by banning "non-essential medical procedures," destabilized supply chains by closing "non-essential businesses," failed to establish effective contact tracing procedures, and failed to immediately educate the public on the necessity of hand washing and covering coughs and sneezes and on the importance of staying home when sick with any disease, which are all scientifically-tested, effective methods of disease control. At no time during the COVID-19 emergency did Governor Eric J. Holcomb call in the National Guard to set up field hospitals in areas heavily affected and to keep potential COVD-19 patients out of hospitals and nursing homes—as recommended by the U.S. Navy in its report to the government after the Spanish flu.

363. Instead of using emergency state police powers to coordinate scientifically supported responses, the Government Defendants encouraged and enacted Rights limiting health measures that had not been used in more than 100 years which had been shown to be ineffective for controlling and preventing pandemic disease outbreaks at that time, ignored science, and created harassing public messages that implied all those who did not wear masks, including but not limited to the medically disabled, were not caring citizens.

364. Jennifer Reinoehl and other similarly situated disabled people have had to bear harassment and discrimination as a result of mask apparel mandates, no exemption store policies by the Business Defendants, and the harmful messages by Government Defendants that encourage this discrimination.

365.    Affidavits of the people who were witnesses to the discrimination Jennifer Reinoehl underwent will be submitted during discovery. A DVD containing all the recorded incidents will also be submitted.

366.    Plaintiff brings this lawsuit under the Federal Constitution, 42 U.S.C. § 1983, 45 CFR §46.116, 29 U.S.C. § 701, and 42 US Code § 12101. She seeks declaratory relief and damages from Beacon, Menard, Inc., Sephora, Krispy Kreme, and AMC Theaters. She also seeks declaratory relief from the CDC, Dr. Anthony Fauci, the FDA, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Health Department, the St. Joseph County Council, the Elkhart County Health Department, the Elkhart County Council.

## V.    CAUSES OF ACTION

367.    This lawsuit challenges the mask recommendations, mandates, policies, and orders enacted by and recommended by the Defendants.

## COUNT I: VIOLATION OF AMERICAN DISABILITIES ACT AND THE REHABILITATION ACT OF 1973

368.    All paragraphs of the Complaint are incorporated herein.

369.    At all times relevant and material hereto, Jennifer Reinoehl had and continues to have lung and heart issues, among other disabilities, that substantially limit several major life activities including but not limited to breathing, climbing stairs, grocery shopping, and walking.

370.    Jennifer Reinoehl is physically unable to wear mask apparel because of her disabilities.

371.    At all times relevant and material hereto, Krispy Kreme Store was a "public accommodation" within the meaning of the ADA Title III because it was a "restaurant," Defendant's operation of which affected commerce among the several States.

372.    At all times relevant and material hereto, AMC 14 was a "public accommodation" within the meaning of the ADA Title III because it was a "motion picture house," Defendant's operation of which affected commerce among the several States.

373.    At all times relevant and material hereto, Menard Store and Sephora Store were "public accommodations" within the meaning of the ADA Title III because they were "sales establishments," Defendant's operation of which affected commerce among the several States.

374.    At all times relevant and material hereto, Memorial Hospital and Beacon's Granger Hospital were "public accommodations" within the meaning of the ADA Title III because they were "hospitals," Defendant's operation of which affected commerce among the several States.

375.    At all times relevant and material hereto, Main Street Medical Group was a "public accommodation" within the meaning of the ADA Title III because it was a "professional office of a health care provider," Defendant's operation of which affected commerce among the several States.

376.    Jennifer Reinoehl, on the basis of her disability, which prevents her from wearing mask apparel, was excluded from services of and subjected to discrimination by Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, the Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Council, and the Elkhart County Health Department as prohibited by the ADA Title II.

377.    Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, the Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Council, and the Elkhart County Health Department are "public entities" as defined by the ADA Title II.

81

378.     Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, the

Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health

Department, the Elkhart County Council, and the Elkhart County Health Department denied

Jennifer Reinoehl the opportunity to participate in activities that were not separate from the

activities of the general population as prohibited by the ADA Title II.

379.     Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, the

Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health

Department, the Elkhart County Council, and the Elkhart County Health Department directly and

through contractual or other arrangements used criteria and methods of administration that

subjected Jennifer Reinoehl to discrimination on the basis of disability as prohibited by the ADA

Title II.

380.     Jennifer Reinoehl, a qualified individual with a disability in the United States as defined

by the Rehabilitation Act of 1973, was solely by reason of her disability subjected to

discrimination under the programs and activities by the CDC and Dr. Anthony S. Fauci.

381.     At all times relevant and material hereto, the CDC and Dr. Anthony S. Fauci were a part

of an Executive agency when conducted their mask recommendations, policies, orders,

experiments, and mandates programs and activities.

382.     By encouraging and enforcing mandates, orders, recommendations, policies or practices

of denying entry to public accommodations and government buildings, Defendants imposed or

applied eligibility criteria that tended to screen out individuals with disabilities that prevented

them from wearing mask apparel.

383.     The "exemptions" written on paper by the CDC, Governor Eric J. Holcomb, Dr. Kristina

M. Box, the Marion City-County Council, the Marion County Health Department, the the St. Joseph

82

County Council, the St. Joseph County Health Department, the Elkhart County Council, and the Elkhart County Health Department were written in such a way that encouraged and allowed businesses and government employees to ignore them and were therefore meaningless.

384.    Public propaganda campaigns by the CDC, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, the Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Council, and the Elkhart County Health Department were performed in such a way as to encourage discrimination against individuals with disabilities that prevented them from wearing a face mask in violation of the Rehabilitation Act of 1973 and the ADA Title II.

385.    Instead of denying Jennifer Reinoehl entry into their places of public accommodation, the Business Defendants could have permitted her to enter without mask apparel since the public accommodations were large enough to maintain 6 feet distance between her and other shoppers and dots were placed on the floor at 6 foot intervals for lines so people could properly space themselves from others.

386.    Instead of denying Jennifer Reinoehl entry into their places of public accommodation, the Business Defendants could have permitted her to enter without mask apparel while ensuring that she complied with social distancing protocols.

387.    Similarly, the Courthouses and Government buildings that denied Jennifer Reinoehl entry or detained her in ways that prevented her from exercising her 1st Amendment Rights without putting her life at risk, could have could have permitted her to enter without mask apparel since the buildings were large enough to maintain 6 feet distance between her and others, physical barriers were in place between her and Court Clerks, chairs were tiered off to maintain social distancing protocols during public meetings, and during at least one of the public St. Joseph

County Council meetings was limiting the number of individuals in the meeting room at one time.

388.    By denying entry to Jennifer Reinoehl because she could not wear mask apparel, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, the Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Council, the Elkhart County Health Department, Menard, Inc, Krispy Kreme, Beacon, Sephora, and AMC 14 through their agents and employees, failed to make a reasonable modification to their policies or practices of denying entry to people not wearing mask apparel.

389.    Permitting Jennifer Reinoehl to enter Krispy Kreme Store, Menard Store, Main Street Medical Group, Memorial Hospital, Beacon's Granger Hospital, AMC 14, and Sephora Store, without mask apparel would not have fundamentally altered the nature of goods or services offered by these Defendants.

390.    Permitting Jennifer Reinoehl to enter Krispy Kreme Store, Menard Store, Main Street Medical Group, Memorial Hospital, Beacon's Granger Hospital, AMC 14, and Sephora Store, without mask apparel would not have imposed any economic burden or undue hardship on these Defendants.

391.    Permitting Jennifer Reinoehl to enter Krispy Kreme Store, Menard Store, Main Street Medical Group, Memorial Hospital, Beacon's Granger Hospital, AMC 14, and Sephora Store, without mask apparel would not have place other people in these accommodations at risk for contracting COVID-19 because she would have maintained 6 feet of distance from others.

392.    According to the FDA EUA referenced in ¶104 and ¶105, cloth and non-medical masks must be labeled "non-medical." These masks are being regulated as "apparel" and cannot have

claims they prevent disease transmission on their packaging. Federal, State, and local government agencies cannot mandate apparel on medical grounds, especially when doing so discriminates against disabled people. Businesses cannot mandate apparel that discriminates against disabled people.

393. Jennifer Reinoehl was discriminated against at the South Bend City-County Building because of her disability by being harassed, detained, and prevented from speaking at a County Council meeting because of that harassment. She was harassed and prevented from being able to file lawsuits and appeals in exercise of her First Amendment rights at the Mishawaka County Courthouse and the Indiana Court of Appeals as a direct a proximate result of the mask recommendations by the CDC, and mask mandates by Indiana state and local government agency mandates. She had to risk her life and wear a mask to file and to obtain Court documents and to file an appeal at both the South Bend County Court House and the Indiana Court of Appeals.

394. The CDC's current restrictions requiring masks for travel prevent Plaintiff from attempting to take air flights. Even after President Biden's executive order, only two airlines allow disabled persons to fly without a mask because of mask apparel mandates. Jennifer Reinoehl has taken flights in the past and plans to take them in the future, but she will not go to the expense of planning a vacation when she can be harassed, discriminated against, and potentially prohibited from flying.

395. The Business Defendants all operate places of public accommodation. Jennifer Reinoehl has been constantly singled out for harassment and prohibited from entering places of public accommodation owned by Beacon, Menard, Inc., Sephora, Krispy Kreme, and AMC Theaters because she is unable to wear a mask due to her disability. These businesses denied her the

accommodation of maintaining a (6)-foot distance from other patrons. In one case, Menards, Inc. allowed her to shop throughout her store and then prevented her from purchasing her goods. There was only one other shopper in line at the checkout at the time and a 6 foot distance could be maintained from this individual.

396.     Jennifer Reinoehl is an involved citizen who has spoken at past County Council meetings and who would like to speak and attend future County Council meetings without harassment because of her disability.

397.     No citizen of the United States can make predictions as to whether or not they will need to enter a Courthouse in the future, but if needed, Jennifer Reinoehl would like to be able to do so without harassment because of her disability.

398.     Jennifer Reinoehl must continue visiting Beacon offices and hospitals even if she continues to be harassed because her children and loved ones use doctors in that system.

399.     Jennifer Reinoehl plans to continue shopping at Menards, Inc., Sephora, and Krispy Kreme as long as she knows she (and other disabled persons) will not be harassed at their entrances or checkouts.

400.     Jennifer Reinoehl plans to continue patronizing AMC Theaters, also, as long as she does not have to fear harassment. It is tradition for her husband and her to see a movie on their anniversary, and to the best of her knowledge this is only the third year in 21 years of marriage that they have not been able to do that. It is also tradition for their entire family to see a movie on New Year's Day. To the best of her knowledge, 2021 is the first year in approximately 15 years since they started the tradition they were not able to do that because of discriminatory mask policies and fear of harassment.

401. The Plaintiff told each business and told government employees that she had a disability and could not wear a mask because of it. She offered to show them her inhaler with her doctor's information on it or her doctor's note and even after showing proof, she was still harassed, detained, prevented from entering public accommodations, and prevented from submitted Court documents.

402. The CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, the Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, Beacon, the Elkhart County Council, and the Elkhart County Health Department ran public campaigns and made public statements that were discriminatory and that encouraged discrimination toward those with medical disabilities who could not wear mask apparel.

403. Without injunctive relief, Plaintiff and those similarly situated, will suffer irreparable harm, which includes, but is not limited to, the following: loss of her State and Constitutional rights and freedoms and other losses which will continue to cause her pain and suffering and which may cost her life, as she may be forced to make the choice between not wearing mask apparel and things including but not limited to risking her life in order to file information for this lawsuit, risking her life in order to seek medical care for her and her family, or risking her life in order to shop for items needed by her and her family.

404. Plaintiff brings this lawsuit under the U.S. Constitution, the ADA, Rehabilitation Act of 1973, and corresponding Federal law. She seeks declaratory relief, injunctive relief, and damages from the unconstitutional deprivation of rights and the disregard for the ADA.

405. Mask mandates abrogate the ADA, Federal and State laws preventing discrimination, as well as Constitutional Rights of the Disabled.

87

406.    The Defendants, through their actions, have exceeded their authority and deprived

Plaintiff of her fundamental rights, privileges and immunities afforded under the law and the

Plaintiff seeks damages, declaratory relief, and injunctive relief to prevent such further

deprivation.

## COUNT II: VIOLATION OF FIRST AMENDMENT AND INDIANA CONSTITUTION ARTICLE 1

407.    All preceding paragraphs are incorporated herein.

408.    The U.S. Const., 1st Amendment states in pertinent part,

> "Congress shall make no law respecting an establishment of
> religion or prohibiting the free exercise thereof or abridging the
> freedom of speech..."

409.    The Indiana State Constitution states in Art. 1 § 9,

> "No law shall be passed, restraining the free interchange of thought
> and opinion, or restricting the right to speak, write, or print, freely,
> on any subject whatever; but for the abuse of that right, every
> person shall be responsible."

410.    Sticking a mask of any kind over your mouth while in public mechanically abridges your

freedom of speech by muffling your voice and making your words difficult to understand.

411.    Further, while some people, such as Jennifer Reinoehl, cannot wear non-medical masks

because of disabilities, other people may choose to not wear non-medical masks out of protest

against the discrimination suffered by disabled people during mask mandates.

412.    In *Tinker v. Des Moines Independent Community School District* (1969) (which

addressed whether students could wear symbols of their support to end the Vietnam War) the

Supreme Court stated in pertinent part

> "our Constitution says we must take this risk, *Terminiello v.*
> *Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our
> history says that it is this sort of hazardous freedom—this kind of
> openness—that is the basis of our national strength and of the
> independence and vigor of Americans who grow up and live in this

88

> relatively permissive, often disputations, society. In order for the
> State…to justify prohibition of a particular expression of opinion,
> it must be able to show that its action was caused by something
> more than a mere desire to avoid the discomfort and
> unpleasantness that always accompany an unpopular viewpoint."

413.   The Government Defendants cannot show how forcing the public to wear a "non-medical" mask which the FDA is refusing to regulate and which the FDA clearly warns their manufacturers about making claims they can prevent disease transmission is an action they ordered based on anything but "a desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."

414.   The Government Defendants have made public statements that show they believe wearing masks is a popular viewpoint and that those who do not wear masks do so because of reasons that discomfort them and are unpleasant to the Government Defendants.

415.   Plaintiff and all other citizens have the right to speak freely in the State without being mechanically barred from doing so.

416.   Plaintiff and all other citizens have the right to protest non-medical mask mandates by refusing to wear a non-regulated, non-medical mask, whose manufacturers cannot make claims about its ability to prevent disease transmission.

417.   The Indiana State Constitution states in Art. 1 § 1-2, in pertinent part,

> "Section 2. All men shall be secured in the natural right to worship
> Almighty God, according to the dictates of their own consciences.
> Section 3. No law shall, in any case whatever, control the free
> exercise and enjoyment of religious opinions, or interfere with the
> rights of conscience."

418.   Non-medical masks have been used since ancient times in pagan religious ceremonies to ward off evil spirits and prevent illness.

419.    During the 1910-1911 Manchurian pneumonic plague, masks were stamped with the

Imperial Seal and worn by citizens as amulets to prevent infection—sometimes worn around

necks or weapons instead of covering the nose and mouth. (Exhibit 36)

420.    Wearing a non-medical mask as a preventative when it failed to prevent disease

transmission during the Spanish Flu of 1918-1919 and failed to stop bacteria from travelling

through it in multiple experiments is equivalent to wearing a pagan religious talisman on one's

face for the same purpose.

421.    Wearing talismans and other pagan, non-medical masks is against Plaintiff's religious

beliefs.

422.    Mandating everyone wear non-medical masks to prevent disease when the mask

manufacturers cannot make claims they prevent disease transmission is the same as the State

establishing a religion in which the Mask Deity prevents its wearers from becoming infected

with disease.

423.    The State cannot mandate the Plaintiff follows its religion. Plaintiff has the right to freely

exercise her religion according to the dictates of her own conscious.

424.    The U.S. Const., 1st Amendment states in pertinent part,

> "Congress shall make no law…abridging…the right of the
> people…to petition the Government for a redress of grievances."

425.    The Indiana State Constitution states in Art. 1 § 12, in pertinent part,

> All courts shall be open; and every man, for injury done to him in
> his person, property, or reputation, shall have remedy by due
> course of law. Justice shall be administered freely, and without
> purchase; completely, and without denial; speedily, and without
> delay.

426.    Plaintiff has been harassed at two courthouses within the state and prevented from filing a

lawsuit, from filing documents related to that lawsuit, and from filing an appeal for that lawsuit

unless she wore a mask. For anyone to have to choose between putting his or her life in danger to exercise his or her 1st Amendment rights or to fail to seek justice and preserve his or her life is unconstitutional by both the U.S. and Indiana Constitutions.

427.    Plaintiff has been harassed on more than one occasion and detained when trying to attend St. Joseph County Council meetings.

428.    The Councilman who represents the Plaintiff in the St. Joseph County Council meetings, Councilman Pfeil, did not feel the Council needed to change the County policies, mandates, and orders so that Plaintiff would no longer be harassed before attending these meetings.

429.    As a direct and proximate cause of Government Defendants' actions and/or omissions stated herein, Plaintiff has suffered damages.

430.    As a direct and proximate cause of Government Defendants' actions and/or omissions stated herein, Plaintiff has suffered a deprivation of her fundamental rights, privileges, and immunities afforded under the law and seeks damages, reparations, declaratory relief, and injunctive relief to prevent such further deprivation.

## COUNT III: VIOLATION OF FOURTH AMENDMENT

431.    All preceding paragraphs are incorporated herein.

432.    The U.S. Const., 4th Amendment states in pertinent part,

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…"

433.    Mask mandates with exemptions as written require businesses in the community to perform illegal searches of those entering each place of public accommodation. The business or government agent, including but not limited to police officers, must first search for a mask, and if one is not seen, the business asks the customer if they have one. If the entrant claims he or she

has a medical exemption, the business or government agent then can and in some cases must search the person for proof of that exemption.

434.    Mandates including but not limited to the ones enacted by St. Joseph County forced businesses to enforce the mandate for the government and search citizens for masks and medical exemptions or be fined for not doing so. Mandates, including but not limited to the one that existed in Elkhart County, officially stated this search was necessary. Other mandates with listed exemptions left businesses and government agents to determine how they could verify someone qualified for an exemption under the mandate. Many times, they determined that the only way was to ask citizens to see verification, thus searching them for it.

435.    For example, after Jennifer Reinoehl spoke with Lt. Steven E. Shively, the police officers stationed at the Mishawaka County Courthouse, stopped her upon seeing she did not have a mask and told her she needed to produce proof of her disability in order to continue although they allowed her entry once the proof was given. The police officers could not reasonably suspect she did not have a breathing disability. Further, they were not searching for evidence Jennifer Reinoehl had committed a crime, but rather searching for evidence that proved Jennifer Reinoehl was not disobeying the emergency mandate requiring individuals to wear mask apparel. Instead of believing Jennifer Reinoehl was innocent until proven guilty they disregarded 4th and 5th Amendment Rights in their desire to comply with state and local mask mandates.

436.    Another example is when Jennifer Reinoehl attempted to enter GameStop located in Mishawaka, IN on November 26, 2020. She was stopped at the door by an employee when he saw she was not wearing a mask. When she explained that she had a breathing disability, she was asked to produce proof of this disability. This non-government employee was acting on the government's behalf to perform the same search performed by the police officers in ¶435—and

he was doing so under penalty of fine. Again, the search was not because the employee had
reason to believe Jennifer Reinoehl did not have a medical disability or even that she had
committed a crime. The search was made because the employee wanted proof that Jennifer
Reinoehl was not disobeying an emergency mandate requiring individuals to wear mask apparel.
Instead of believing Jennifer Reinoehl was innocent until proven guilty they disregarded 4th and
5th Amendment Rights in their desire to comply with state and local mask mandates.

437.    As a direct and proximate cause of Government Defendants' actions and/or omissions
stated herein, Plaintiff has suffered a deprivation of her fundamental rights, privileges, and
immunities afforded under the law and seeks damages, reparations, declaratory relief, and
injunctive relief to prevent such further deprivation.

## COUNT IV: VIOLATION OF FIFTH AMENDMENT

438.    All preceding paragraphs are incorporated herein.

439.    The U.S. Const., 5th Amendment states in pertinent part,

> "No state shall make or enforce any law which shall abridge the
> privileges or immunities of citizens of the United States; No person
> shall be deprived of life, liberty, or property without due process of
> law..."

440.    As stated in Count III, Jennifer Reinoehl was presumed to be guilty of violating mask
apparel mandates, orders, and policies without evidence that she was guilty of doing so.

441.    Mask apparel mandates, orders, and policies prohibit people from freely entering places
of public accommodation.

442.    Quarantine laws that allow for the isolation of the sick and sometimes their immediate
families have been legal for over a century. These laws, as written in the state of Indiana, allow
the quarantined individual access to judicial review of the quarantine to determine its necessity
within one week of the implementation of the quarantine.

443.    In addition to quarantining sick people, the United States government has time-tested

methods of disease control that are also supported by centuries of work. These include

developing and improving the accuracy of tests, contact tracing, developing and improving

treatments, promoting public safety messages for things like hand washing, educating the public

on the disease, and creating field hospitals to treat and isolate sick patients.

444.    The government agents and agencies enacted rights-inhibiting measures without due

process procedures in place. In fact, the Courts were closed down and then became backed up

with cases, making it difficult to obtain Court review.

445.    Citizens, like Jennifer Reinoehl, who could not wear masks, were discriminated against

and prevented from entering Courts.

## **COUNT V: VIOLATION OF FOURTEENTH AMENDMENT**

446.    All preceding paragraphs are incorporated herein.

447.    The U.S. Const., 4th Amendment states in pertinent part,

> "No State shall make or enforce any law which shall abridge the
> privileges or immunities of citizens of the United States; nor shall
> any State deprive any person of life, liberty, or property, without
> due process of law; nor deny to any person within its jurisdiction
> the equal protection of the laws."

448.    In the October 13, 2020 County Council meeting which Jennifer Reinoehl attended, the

St. Joseph County Health Department requested a mask mandate. Numerous citizens appeared

and presented the County Council with both scientific and legal evidence against the mandate. A

Councilman told those gathered that he was siding with the St. Joseph County Health

Department because he was worried that if the evidence presented by the citizens was wrong he

might be indirectly responsible for deaths in the community. Although he questioned the validity

of the citizens presenting evidence, he did not question the evidence of the Health Department

which was solely based on numbers of "positive" individuals that are inaccurate.

94

449.    When the Councilman said if he did not enact the mandate and the citizens' evidence was

wrong, he would have any additional deaths on his conscience, he did not mention that if the

citizen presented evidence was correct, he would not only have additional deaths on his hands

but also he would have trampled citizens' rights in the process.

450.    When public health agents are given a god-like status, are presumed to never lie and

never err among other things, and are given tyrannical powers based solely on their own word

and evidence—especially when that evidence is flimsy and circumstantial, democracy no longer

exists. To provide community members with an opportunity to speak out against a bill or policy

but at the same time refuse to consider their information because it did not come to them from

the health department is not due process or neutral review. In fact, there is nothing fair about it

because the members of the council are viewing the matter with extreme bias and no amount of

evidence presented by the citizens would change their opinion of the matter.

## A. VIOLATIONS OF PROCEDURAL DUE PROCESS

451.    All previous paragraphs are incorporated herein.

452.    Mask apparel that lowers blood oxygen levels threatens a person's life—for example, any

person who goes to the hospital and is found to have blood oxygen levels that are below 93%

will be put on a ventilator as a matter of policy. Even though a paper published by top Chinese

doctors in February 2020 recommended against this for those testing positive with COVID-19,

United States hospitals continue to use ventilators at high rates for COVID-19 patients.

453.    Ventilators are dangerous, last resort machines. In all patients with acute respiratory

distress syndrome, including those whose syndrome is caused by COVID-19, survival rate until

the time the patient comes off the ventilator is 60% and at 1 year after being put on a ventilator it

is about 30%.

449.    When the Councilman said if he did not enact the mandate and the citizens' evidence was wrong, he would have any additional deaths on his conscience, he did not mention that if the citizen presented evidence was correct, he would not only have additional deaths on his hands but also he would have trampled citizens' rights in the process.

450.    When public health agents are given a god-like status, are presumed to never lie and never err among other things, and are given tyrannical powers based solely on their own word and evidence—especially when that evidence is flimsy and circumstantial, democracy no longer exists. To provide community members with an opportunity to speak out against a bill or policy but at the same time refuse to consider their information because it did not come to them from the health department is not due process or neutral review. In fact, there is nothing fair about it because the members of the council are viewing the matter with extreme bias and no amount of evidence presented by the citizens would change their opinion of the matter.

## A. VIOLATIONS OF PROCEDURAL DUE PROCESS

451.    All previous paragraphs are incorporated herein.

452.    Mask apparel that lowers blood oxygen levels threatens a person's life—for example, any person who goes to the hospital and is found to have blood oxygen levels that are below 93% will be put on a ventilator as a matter of policy. Even though a paper published by top Chinese doctors in February 2020 recommended against this for those testing positive with COVID-19, United States hospitals continue to use ventilators at high rates for COVID-19 patients.

453.    Ventilators are dangerous, last resort machines. In all patients with acute respiratory distress syndrome, including those whose syndrome is caused by COVID-19, survival rate until the time the patient comes off the ventilator is 60% and at 1 year after being put on a ventilator it is about 30%.

454.    Wearing a mask increases the likelihood hospital ER patients will be put on a ventilator unnecessarily because it lowers blood oxygen levels and could lower them below 93%. Being put on a ventilator increases the person's chances of death and serious injury when they are placed on it unnecessarily—especially in disabled populations that might already have lower blood oxygen levels prior to wearing a mask. Since the oxygen lowering effects lasted for hours after Jennifer Reinoehl removed the mask—hospital ER staff may not immediately connect the low blood oxygen levels with mask use and may instead attribute them to serious disease.

455.    Mandating mask apparel interferes with liberties found in the 1st and 4th Amendments.

456.    None of the following due process protections were afforded to Plaintiff as required by the United States Constitution when the mask mandate was enacted by Governor Holcomb: a)No processes of notice; b) No processes that permit evaluation by a neutral arbitrator; c) No processes that provide for an opportunity to be heard; d) No processes that offer an opportunity to present witnesses; e) No processes that permit an opportunity to cross examine witnesses; f) No processes that allow for a reasoned decision; and, g) No processes that provide for an opportunity for an appeal.

457.    None of the following due process protections were afforded to Plaintiff as required by the United States Constitution when the Health Departments and Councils enacted mask mandates: a) No processes that permit evaluation by a neutral arbitrator; b) No processes that offer an opportunity to present witnesses; c) No processes that permit an opportunity to cross examine witnesses; d) No processes that allow for a reasoned decision; and, e) No processes that provide for an opportunity for an appeal.

458.    Although the lack of some of these due process procedures might be acceptable for something, such as a zoning dispute, the Government Defendants in this case did not simply

change what could be built on a tract of land. The Government Defendants mandated that citizens of the state wear experimental, unproven mask apparel, which put their lives at risk, deprived them of Constitutional Rights, and violated several laws. The exemptions that were nominally listed for the disabled in official documents were not allowed in practice by any of the Defendants. In fact, the government agencies that wrote the exemptions into their mandates and recommendations then proceeded to tell the public that those who did not wear masks were rebellious and uncaring among other hurtful things. The result of their actions was that massive ADA violations occurred not only to the Plaintiff but to others similarly situated, to which the Government Defendants turned a blind eye when the Plaintiff complained to them directly and through Indiana's Tort Claims process.

459.    It is clear from the public statements made by these government officials they were prejudiced against the disabled persons who could not wear masks, believed them to be unworthy of the exemptions, and believed them to be spreading the disease without any direct evidence random controlled trials to support their claims. The Plaintiff did not hear one single public message from any of them telling others to be kind to those who could not wear masks because they were disabled.

460.    Not one of these government officials condemned Disney when it refused to allow an autistic child into its stores without a mask despite the story making national news headlines.

461.    Having to call government agencies for clarification of mandates, especially since cell phones are not allowed in government buildings in Indiana, is not an adequate procedure that can be used to remedy the deprivation of rights. Further, a phone call to the Governor's office did not prevent the Plaintiff from continuing to be harassed after the call was finished by Potawatomi Zoo employees nor did it prevent her from being harassed at other places of business. In

addition, Governor Eric J. Holcomb specifically allowed County Councils to make harsher rules that discriminated against citizens. County Councils are not nearly as accessible by phone as the Governor's office had been.

462.    As a direct and proximate cause of Government Defendants' actions and/or omissions stated herein, Plaintiff has suffered damages.

463.    As a direct and proximate cause of Government Defendants' actions and/or omissions stated herein, Plaintiff has suffered a deprivation of her fundamental rights, privileges, and immunities afforded under the law and seek damages, declaratory relief, and injunctive relief to prevent such further deprivation.

## B. VIOLATIONS OF SUBSTANTIVE DUE PROCESS

464.    All paragraphs of the Complaint are incorporated herein.

465.    Government actions that burden the exercise of fundamental rights are subject to strict scrutiny and will be upheld only when they are narrowly tailored to a compelling government interest.

466.    In addition to the ADA, Plaintiff's 1st and 4th Amendment Rights have been trampled. She has been detained and harassed while attempting to attend County Council meetings and exercise her ability to participate in the political process, and she has been prevented from participating when that detainment made her late to a meeting and therefore unable to sign up to get on the docket. She has been prevented from filing necessary Court documents, searched and harassed at the entrances of courthouses, and searched, harassed, and prevented from entering many places of public accommodations, including but not limited to the ones specifically mentioned in this Complaint.

467.    Mask mandates have not been enacted upon the general public in the United States since the 1918 Spanish Flu pandemic, wherein they failed to stop both the spread and fatality rate of the pandemic, even in controlled military situations (Exhibit 8).

468.    The current (January 2021) case-fatality rate for COVID-19 in the U.S. is about 1.7%. This is lower than the 9.6% case-fatality rate COVID-19 was initially *predicted* to have in April 2020.

469.    That Indiana's case-fatality rate is at 1.8% and higher than the national average should shock its leaders into focusing more on preventing deaths through better treatment methods instead of attempting to prevent disease transmission through scientifically questionable means.

470.    Thankfully, COVID-19 is not a deadly disease nor is it as contagious as other diseases, such as flu. For reference, in 2009, the U.S. case-fatality rate for tuberculosis was about 4.6%, and tuberculosis transmission rates have been reduced without the use of mandated non-medical masks. The case-fatality rate for the 2017-2018 flu grew up to 10.8% according to CDC records, but non-medical masks were *not* mandated during that pandemic. The case-fatality rate for the 2008-2009 swine flu pandemic ranged from 1-10%—again non-medical masks were *not* mandated to reduce transmission. By doing the math based on the numbers given on the World Health Organization website, seasonal and pandemic flu has a worldwide case-fatality rate of 5.8%-21.7% even with a vaccine. Non-medical masks have *never* been mandated for seasonal flu and have not been mandated for pandemic flu in over 100 years.

471.    The case fatality rate for Ebola disease is about 50% and ranges from 25% to 90%, but when Ebola disease cases appeared in the United States, non-medical masks were *not* mandated—even for doctors returning home from Africa after being exposed to Ebola disease firsthand. Masks and other Personal Protective Equipment was thought to have caused the spread

of ebola in African nations because medical workers struggled to put it on, wear, and take it off correctly.

472.    Prior to COVID-19, Dr. Anthony S. Fauci was adamant that droplet spread respiratory diseases (as defined above for example in ¶44) like COVID-19 were difficult to spread asymptomatically.

473.    Asymptomatic spread does not change the fact that even surgical masks have holes too large to filter out viruses. An asymptomatic or presymptomatic person wearing a mask incorrectly without symptoms will spread the disease at a much greater rate than an asymptomatic person who is covering all of his or her coughs, washing hands after blowing his or her nose or coughing into his or her hands, and not wearing a mask.

474.    The case-fatality rate for HIV in person-years (which are adjusted for time since HIV kills slowly) is currently 2% in the USA. (HIV technically has an 80-90% case-fatality rate, but most people die from complications of the disease after many years.) HIV medications can cost up to $20,000 per month, and HIV positive patients must be on them for decades. People with HIV are *not* mandated to wear condoms when having sex by any government agency worldwide even though it has a higher case-fatality rate in person years than COVID-19 and leads to costly medical interventions for decades that often fall upon the state to fund.

475.    Condoms are regulated as medical devices. Mask apparel is not.

476.    This disparate treatment lacks a real or substantial scientific relation to a need for a mask mandate intervention to control the spread of COVID-19, and the mandate is arbitrary in nature.

477.    The Plaintiff has a right to protection from arbitrary action of the government under the Administrative Procedure Act § 706(2)(A).

478.   Substantive Due Process prevents the government from engaging in conduct that "shocks the conscious" *or that interferes with the concept of ordered liberty. Rochin v. California*, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952)

479.   Mandates issued by and encouraged by Government Defendants to wear items regulated as apparel when other items regulated as medical devices are not mandated or encouraged to be mandated by these same Government Defendants for deadlier diseases constitutes arbitrary, capricious, irrational and abusive conduct that interferes with Plaintiff's liberties protected by the due process clause of the U.S. Constitution, 14th Amendment.

480.   The actions of the Government Defendants to compel citizens and visitors to the State of Indiana to give up the freedoms afforded them by Federal law and the U.S. Constitution are promulgated on superstitious and speculative grounds.

481.   The actions of the Government Defendants shock the conscience of the citizens of the United States by mandating apparel upon all citizens and visitors to the State of Indiana as if mask apparel were a regulated medical device with a centuries-long proven track record for stopping disease transmission.

482.   The actions of the Government Defendants in publicly blaming those who do not wear masks for the spread of COVID-19, including those who are medically disabled and cannot wear masks, without direct evidence randomized controlled trials, is arbitrary and capricious.

483.   The actions of the Government Defendants do not comport with the traditional ideas of fair play and decency.

484.   Randomly mandating apparel is causing citizens of the United States to give up their freedoms and put their lives at risk.

485.    As a direct and proximate cause of Government Defendants' actions and/or omissions stated herein, Plaintiff has suffered damages.

486.    As a direct and proximate cause of Government Defendants' actions and/or omissions stated herein, Plaintiff has suffered a deprivation of her fundamental rights, privileges, and immunities afforded under the law and seeks damages, reparations, declaratory relief, and injunctive relief to prevent such further deprivation.

## COUNT VI: VIOLATION OF TITLE 45 §46.116

487.    All preceding paragraphs are incorporated herein.

488.    Title 45 §46.116 protects volunteers from participating in experiments against their will and without understanding the risks of the experiment.

489.    The CDC and Dr. Anthony S. Fauci have recommended and pressured states to adopt mask apparel mandates. They have mandated mask apparel on those riding in airlines.

490.    After mandates were in place, they collected research data based on those mask mandates, thereby running an experiment without first obtaining the consent of those, who like Jennifer Reinoehl, were subject to mask mandates.

491.    The CDC and Dr. Anthony S. Fauci have recommended, pressured, and mandated citizens wear an experimental device. Then, they forced them to participate in their experiments concerning that device and the effects it has on public health without obtaining their consent to the experiment or informing them of the risks of participating.

492.    As a direct and proximate cause of the CDC and Dr. Anthony S. Fauci's actions and/or omissions stated herein, Plaintiff have suffered injuries and damages.

493.    As a direct and proximate cause of the CDC and Dr. Anthony S. Fauci's actions and/or omissions stated herein, Plaintiff have suffered a deprivation of their fundamental rights,

privileges and immunities afforded under the law and seek damages, declaratory relief, and injunctive relief to prevent such further deprivation.

## COUNT VII: VIOLATION OF THE FOOD, DRUG AND COSMETICS ACT

494.    All preceding paragraphs are incorporated herein.

495.    21 U.S.C. § 331 prohibits, among other things, (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded. (b) The adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce.

496.    The CDC and Dr. Anthony S. Fauci have misbranded mask apparel as medical devices that prevent infection when there is not direct evidence in the form of randomized controlled trials to support their claims. Randomized controlled trials are an important part of obtaining full FDA authorization for any medical device.

497.    The FDA has not only failed to enforce 21 U.S.C. § 331 by issuing an injunction against the CDC and Dr. Anthony S. Fauci, but also has failed to enforce its own EUA referenced in ¶104 and ¶105.

498.    Government Defendants have allowed the misbranding of mask apparel: They promote mask apparel as if it were a surgical mask that just was not for use in hospitals, redefining the term "non-medical," which according to Merriam-Webster's online dictionary means "not involving, relating to, used in, or concerned with medical care or the field of medicine." They also have allowed mask apparel to be sold in the United States that looks identical to surgical masks, which is confusing to the public and encourages the misbranding.

499.    Sovereign Immunity does not grant Government Defendants the ability to break the laws of the United States Federal Government, even during public emergencies. If citizens can use the

Courts to strike down a law created by Congress that is unconstitutional, citizens can use the Courts to strike down among other things laws, policies, orders, mandates, and recommendations that violate Federal Law and that are unconstitutional.

500.    As a direct and proximate cause of Government Defendants' actions and/or omissions stated herein, Plaintiff have suffered injuries and damages.

501.    As a direct and proximate cause of Government Defendants' actions and/or omissions stated herein, Plaintiff have suffered a deprivation of their fundamental rights, privileges and immunities afforded under the law and seek damages, declaratory relief, and injunctive relief to prevent such further deprivation.

## COUNT VIII: DECLARATORY JUDGEMENT

502.    All preceding paragraphs are incorporated herein.

503.    Plaintiff is an interested party seeking declaration of her rights under the United States Constitution as mask mandates have functioned to deprive Plaintiff of her fundamental rights and caused injuries and damages.

504.    An actual controversy has arisen and now exists between the parties in that Plaintiffs contend, and are informed and believe that Defendants deny that mask mandates and recommendations are in violation of the applicable laws including but not limited to 42 U.S. Code § 12101, the 1st, 4th, 5th, and 14th Amendments of the United States Constitution, and 45 CFR § 46.116.

505.    A judicial declaration for the matters listed below is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

## A. PLAINTIFF CONTENDS AND IS INFORMED AND BELIEVES DEFENDANTS DENY THAT BUSINESSES ENACTING POLICIES OR

## PRACTICES THAT ALL CUSTOMERS WEAR DEVICES THAT PERSONS WITH DISABILITIES ARE UNABLE TO WEAR WITHOUT CLEARLY EXEMPTING THOSE DISABLED PERSONS FROM THE REQUIREMENT FAIL TO COMPLY WITH APPLICABLE LAWS INCLUDING BUT NOT LIMITED TO THE AMERICANS WITH DISABILITIES ACT.

506.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

507.    Plaintiff seek a declaratory judgment that businesses, such as Beacon, Menard, Inc.,

Sephora, Krispy Kreme, and AMC theaters, which have policies requiring all entrants mask

apparel,  cannot mandate dress code requirements that exclude persons with disabilities from

entering their public space and which deprive Plaintiff of liberties granted her under the ADA.

508.    In addition to the declaratory judgments sought herein, Plaintiff seeks further necessary

or proper prospective relief as justice may require.

## B. PLAINTIFF CONTENDS AND IS INFORMED AND BELIEVES DEFENDANTS DENY THAT BUSINESSES ASKING DISABLED CUSTOMERS FOR MEDICAL PROOF OF THEIR DISABILITY IN ORDER TO RECEIVE ACCOMMODATIONS FAIL TO COMPLY WITH APPLICABLE LAWS INCLUDING BUT NOT LIMITED TO THE AMERICANS WITH DISABILITIES ACT AND IS UNCONSTITUTIONAL.

509.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

510.    Under the ADA, a person with a service animal cannot be required to provide proof they

have a disability that requires them to use that service animal.  They are not required to carry

cards proving their disability or answer most questions in regard to their disability. They do not

have to show medications or anything else that might prove they have a disability requiring a

service animal nor do they have to prove the animal is a service animal.

511.    Bringing an animal into a place of business can create health problems. Dogs, for

example, carry disease, and they carry fleas that also carry disease. Some dogs bite and can kill

or severely injure others, including trained service dogs.

512.     Similarly, a person stating he or she has a medical disability and cannot wear apparel required by business policy for entry to the business should not have to show a note from a doctor verifying that disability. The public health danger presented by a non-sick, medically disabled person willing to stay six feet away from other customers is less than the public health danger presented by a person without a disability who brings an untrained animal into a business.

513.     Plaintiff seek a declaratory judgment that businesses, such as Business Defendants, which have policies requiring all entrants wear non-medical masks and facial coverings, cannot require persons with disabilities to show proof of their disability in order to exempt the disabled person from the policy because showing proof deprives Plaintiff and those similarly situated of liberties granted them under the ADA.

514.     In addition to the declaratory judgments sought herein, Plaintiff seeks further necessary or proper prospective relief as justice may require.

## C. PLAINTIFF CONTENDS AND IS INFORMED AND BELIEVES DEFENDANTS DENY THAT BUSINESSES AND GOVERNMENT AGENCIES RECOMMENDING, MANDATING, ENACTING POLICIES AND PRACTICES, AND/OR ORDERING PEOPLE USE MEDICAL DEVICES WHICH ARE NOT FULLY AUTHORIZED BY THE FDA ARE NEGLIGENT AS DEFINED BY RESTATEMENT SECOND OF TORTS AND MAY BE LIABLE FOR DAMAGES CAUSED BY THESE PRODUCTS, INCLUDING BUT NOT LIMITED TO DAMAGES WHEN THE PRODUCTS ARE USED BY DISABLED PERSONS AGAINST THE ADVICE OF THEIR DOCTORS, AND DAMAGES FROM INCIDENTS THAT OCCUR WHEN THE DISABLED PERSON DOES NOT WEAR THEM.

515.     Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

516.     Non-medical masks only are authorized for sale in the United States under FDA emergency use authorization.

517.    Disposable non-medical masks have never undergone any randomized controlled trials to discover direct evidence about their safety and effectiveness. The randomized controlled trial performed by the U.S. military on cloth masks provided direct evidence they were ineffective at preventing viral disease transmission during pandemics even when trained medical professionals used them properly. Observational data collected by the U.S. military during the Spanish flu pandemic showed that mask use across military bases by the general population did not control disease transmission.

518.    It is known that wearing a mask improperly can contribute to the spread of disease.

519.    The general public does not wear medical masks properly even when given visual instruction sheets on proper use. Not wearing masks properly increases disease transmission and serious harm to the public.

520.    Government officials and policy makers do not wear non-medical masks in the way necessary for preventing disease transmission. Not wearing masks properly increases disease transmission and serious harm to the public.

521.    Wearing a mask for more than (15) minutes puts Jennifer Reinoehl's life at risk by reducing her blood oxygen levels for hours and by increasing her heart rate.

522.    Jennifer Reinoehl has been forced to wear a mask in order to file lawsuits. Wearing the mask for more than (15) minutes to file paperwork for lawsuits caused Jennifer Reinoehl to have asthma attacks further putting her life at risk.

523.    Forcing the disabled to wear apparel that puts their lives at risk is negligent.

524.    Plaintiff has been harassed at business entrances, prohibited from entering businesses, and publicly humiliated by business employees enforcing business mask apparel mandates.

525.    Plaintiff has been harassed at government building entrances, prohibited from entering government buildings, and forced to don a mask to file lawsuits in two different Indiana cities. If government agencies believe the "exemptions" listed in the mandates are optional and can be ignored—depriving disabled citizens of their access to the government protections put in place by the Constitution of the United States and the Indiana Constitution—businesses and other public agencies will do the same.

526.    Plaintiff is not the only disabled person who has undergone this harassment. Others have been threatened and even physically assaulted at the doors of businesses in Indian.

527.    Further, by mandating some of the population wear these devices and exempting others, it allows those who cannot medically wear the devices to easily be singled out and attacked or harmed—physically, psychologically, and emotionally—and those mandating these devices are responsible for that harm.

## D. PLAINTIFF CONTENDS AND IS INFORMED AND BELIEVES THAT DEFENDANTS DENY THAT A STATE EXERCISING ITS POLICE POWER TO MANDATE NON-MEDICAL DEVICES ON MEDICAL GROUNDS IS UNCONSTITUTIONAL.

528.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

529.    The FDA has required masks mandated by government agencies and officials to be labeled as "non-medical."

530.    The FDA has refused to regulate masks mandated by government agencies and officials and instead has classified them as "apparel" and required them to be regulated as such.

531.    By the FDA's own publicly published definition and the information on other Federal Government websites, something the Plaintiff and all other Defendants had access to through the Internet, the masks being mandated are both "non-medical" and "apparel."

532.    Non-medical devices and apparel do not have a reasonable relationship to public health to overcome the rights violations caused by mandating them.

### F. PLAINTIFF CONTENDS AND IS INFORMED AND BELIEVES DEFENDANTS DENY THAT PUBLIC HEALTH CAMPAIGNS WHICH USE STATEMENTS INCLUDING BUT NOT LIMITED TO "WEARING MASKS IS HOW PEOPLE CAN SHOW THEY CARE ABOUT OTHERS" FAILS TO COMPLY WITH THE ADA AND THE REHABILITATION ACT OF 1973 BY DISCRIMINATING AND HARASSING THOSE WHO ARE MEDICALLY DISABLED AND CANNOT WEAR MASK APPAREL INSTEAD OF PROMOTING AN ENVIRONMENT WHERE DISABLED INDIVIDUALS CAN LIVE INDEPENDENTLY.

533.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

534.    There are many reasons why a person may or may not follow a public health campaign recommendation.

535.    The state of Indiana cannot prove as fact nor can they produce any scientifically sound evidence that people who wear mask apparel actually care for others. In fact, observational studies would show that, in general, people who wear masks do not care for others at all. For example, Martin Ney was a German serial killer who wore a mask while sexually assaulting at least 40 children. Dennis Lynn Rader, a.k.a. the BTK killer, liked to tie himself up while wearing a mask, including surgical masks, and take pictures of himself in poses to resemble his victims. Antifa members wear masks, as do members of the Ku Klux Klan, in order to conceal their identities while they are hurting other people.

536.    Instead of basing government campaigns for masks on direct evidence from randomized controlled trials, which they did not have for masks, they based it on emotion which led to Jennifer Reinoehl and other similarly situated disabled persons being harmed.

109

537.    Plaintiff is an interested party seeking declaration of her rights under the United States

Constitution as mask mandates and their propaganda campaigns have functioned to deprive

Plaintiff of her fundamental rights and caused injuries and damages.

538.    In addition to the declaratory judgments sought herein, Plaintiff seeks further necessary

or proper prospective relief as justice may require.

## G. PLAINTIFF CONTENDS AND IS INFORMED AND BELIEVES DEFENDANTS DENY THAT EMERGENCY USE MASK APPAREL NOT LABELED WITH APPROPRIATE WARNINGS FAILS TO COMPLY WITH APPLICABLE LAWS INCLUDING BUT NOT LIMITED TO 21 CFR § 812.5.

539.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

540.    Items classified as investigational devices can be used for medical purposes in the United

States without undergoing full FDA approval, their labels must state clearly, among other things,

"CAUTION - Investigational device. Limited by Federal (or United States) law to investigational

use."

541.    Items offered by the FDA under Emergency Use Authorization are investigational and

should carry this disclaimer.

542.    Persons recommending investigational items should also add this warning, among other

required labeling items, to their recommendation so the public is informed that the item is

investigational and not fully approved.

543.    Since mask apparel is not fully FDA approved, statements about their safety and

effectiveness should be required as described in 21 CFR § 812.5.

544.    Plaintiff is an interested party seeking declaration of her rights under the United States

Constitution as mask mandates and their propaganda campaigns have functioned to deprive

Plaintiff of her fundamental rights and caused injuries and damages.

545.    In addition to the declaratory judgments sought herein, Plaintiff seeks further necessary or proper prospective relief as justice may require.

## H. PLAINTIFF CONTENDS AND IS INFORMED AND BELIEVES THAT DEFENDANTS DENY THAT FORCING CITIZENS TO USE EXPERIMENTAL DEVICES WHICH ARE NOT FULLY APPROVED THROUGH THE FDA'S DRUG DEVELOPMENT PROCESS AND COLLECTING RESEARCH DATA ABOUT THOSE DEVICES FAILS TO COMPLY WITH APPLICABLE LAWS INCLUDING BUT NOT LIMITED TO TITLE 45 §46.116, FAILS TO COMPLY WITH THE NUREMBERG CODE, AND IS UNCONSTITUTIONAL. [4]

546.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

547.    TITLE 45 §46.116 protects citizens from forced experimentation.

548.    Experiments on those who are aware of the risks and can make a free decision to accept them are important in determining if any medical device is safe for the public.

549.    For example, many people have contracted polio and become paralyzed for life because randomized controlled trials were not performed on the oral polio vaccine and reviewed by an independent body. The oral polio vaccine contributed and continues to contribute to polio outbreaks worldwide. Since the oral polio vaccine is cheaper to produce, it was promoted for years as being more effective than the injected version, which is safer. Scientists now believe the oral polio vaccine is no more effective than the injected version, and since the oral version is more dangerous because of the outbreaks it causes, it has not been recommended for use in the United States since 2000.

550.    Mask apparel also might contribute to outbreaks of COVID-19 and other diseases. Without well-designed randomized controlled trials providing us direct evidence of the effectiveness of masks, we could be increasing the spread of COVID-19 or the deaths from it.

---

[4] The steps for full FDA approval are listed here: https://www.fda.gov/patients/learn-about-drug-and-device-approvals/drug-development-process

The trials conducted by the military, electron micrographs showing the size of the holes in mask apparel and the size of viruses, and other trials conducted in recent years support the conclusion masks are not effective disease control measures.

551.    Non-medical masks only are authorized for sale in the United States under FDA Emergency Use Authorization.

552.    Using mask apparel to control the transmission of COVID-19 is experimental. TITLE 45 §46.116 prohibits human experimentation without informed consent. The CDC is currently collecting research data from citizens of the United States from the mask mandates it has put in place and encouraged and therefore running an experiment on the general population, albeit a very different one than the needed randomized controlled trials, which require obtaining informed consent. Unlike most experiments which gather observational data, the CDC and Dr. Anthony S. Fauci are encouraging state government agencies to mandate masks and thus forcing the residents of that state to participate in their experiment whether the residents wish to or not.

553.    Dr. Anthony S. Fauci knows that incorrect use of masks by the general public will spread diseases including COVID-19, and that masks, including but not limited to cloth, surgical, and non-medical masks contain holes that are too large to trap viruses.

554.    By mandating all airlines require masks, the data the CDC collects from airlines concerning COVID-19 infection is data from an experiment in which participants were not offered informed consent.

555.    Mandates put in place by governments and government agencies that require citizens to use experimental devices do not allow for informed consent and are in direct violation of TITLE 45 §46.116 and the Nuremberg Code and are unconstitutional.

556.   Experimental devices, which may hurt or hinder medical situations including the spread of disease, do not have a reasonable relationship to public health to overcome the rights violations caused by mandating them.

557.   Plaintiff is an interested party seeking declaration of her rights under the United States Constitution as public statements may put pressure on the FDA to skip some steps in the review process and function to deprive Plaintiff of her fundamental rights and cause injuries and damages to her and others similarly situated.

558.   In addition to the declaratory judgments sought herein, Plaintiff seeks further necessary or proper prospective relief as justice may require.

## I. PLAINTIFF CONTENDS AND IS INFORMED AND BELIEVES DEFENDANTS DENY THAT IF FDA IS NOT REGULATING DEVICES BEING RECOMMENDED FOR MEDICAL USE BY OTHER GOVERNMENT AGENCIES AT THE STATE AND FEDERAL LEVEL IT FAILS TO COMPLY WITH APPLICABLE LAWS INCLUDING BUT NOT LIMITED TO THE FOOD, DRUG, AND COSMETIC ACT.

559.   Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

560.   Section 201(h) of the Food, Drug, and Cosmetic Act, states that a device is: An instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including a component part, or accessory which is: recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them, intended for use in the...prevention of disease, in man or other animals...and which does not achieve its primary intended purposes through chemical action within or on the body .....

561.   As a medical device, mask apparel does not qualify as a Class I device because the CDC claims it is important in preventing impairment to human life. In addition, even if it were effective to some extent, which it is not, it presents a potential unreasonable risk of illness or injury.

562.    As a medical device, mask apparel does not qualify as a Class II device because "non-medical" face masks have never been sold before in the United States. The NAS Rapid Response stated there was insufficient data to determine if cloth mask apparel would be effective. Without sufficient effectiveness information, knowing that improper use could spread disease and that the general public usually does not use the devices properly, and in light of information available on the health risks that all masks, including cloth masks, create, the FDA should have classified all mask apparel as Class III medical devices and sought more data before allowing them to be sold under their EUA referenced in ¶104 and ¶105.

563.    An example of how devices that are only authorized under emergency use can be dangerous to public health is easily found because the FDA also initially allowed KN-95 masks to be used in the United States in place of N95 masks. However, it was regulating these and soon banned some manufacturers from selling KN-95s as medical devices because after testing they did not meet the standards of an N95 despite the manufacturer's claims. It also banned new applications for emergency use of KN-95s as medical devices after doctors told the FDA there was little use for the product in a medical setting.

564.    The FDA did not stop these same KN-95 manufacturers who had been selling inferior products and could no longer sell their KN-95s as "medical devices" from selling "non-medical" KN-95s as mask apparel. KN-95s, whether capable of filtering 95% of viruses the user is exposed to or not, all increase breathing resistance and can cause serious side effects if worn correctly for long periods of time.

565.    Mask apparel is being sold in medical sections of traditional stores and under medical and health classifications and keywords in online stores. Jennifer Reinoehl notified the FDA of this

early in 2020, but her notice was ignored and the devices continued to be sold under medical categories despite the requirement they be labeled as "non-medical."

566.     This apparel, when disposable, is designed to look identical to surgical masks or N95 masks. The small stamp stating they were "non-medical" frequently placed on the bottom of the box/bag and/or in tiny print and does not offset in the purchaser's mind that they were buying the masks to prevent the transmission of COVID-19 especially after the CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council announced that is what the product was used to do.

567.     Labels were not required by the FDA to state safety warnings, including but not limited to the fact these masks may cause asthma attacks, even though it was known these masks could cause asthma attacks. This has deliberately mislead citizens of the United States and violates the nature of 21 U.S. Code §502 among other laws.

568.     Plaintiff is an interested party seeking declaration of her rights under the United States Constitution as the FDA failed to perform its job as required by the Federal Food, Drug, and Cosmetic Act and that deprived Plaintiff of her fundamental rights and caused injuries and damages to her and others similarly situated.

569.     In addition to the declaratory judgments sought herein, Plaintiff seeks further necessary or proper prospective relief as justice may require.

**J. PLAINTIFF CONTENDS AND IS INFORMED AND BELIEVES DEFENDANTS DENY THAT IF ANY GOVERNMENT AGENCY RECOMMENDS OR MANDATES MEDICAL DEVICES THAT ARE NOT FULLY APPROVED BY THE FDA OR MAKES STATEMENTS ABOUT THEIR SAFETY OR EFFECTIVENESS THEY FAIL TO COMPLY WITH**

## APPLICABLE LAWS INCLUDING BUT NOT LIMITED TO 18 U.S.C. § 1035, 21 U.S.C. § 331, AND THE FOOD, DRUG, AND COSMETIC ACT AMONG OTHERS.

570.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

571.    FDA approval processes are meant to prevent medical harm and ineffective treatments.

572.    The United States government established the FDA the Food, Drug, and Cosmetic Act to rein in serious abuses that had occurred against consumers of food and medical products.

573.    Any medical intervention may be ineffective, dangerous, or both. Without proper research and federal regulation, medical products could cause more harm than the disease in whose name they are used. Further, medical products could contribute to worse diseases or inflict permanent damage on users, such as permanent lung damage.

574.    Since mask apparel is not FDA approved and since the manufacturers themselves are not allowed to state they can be used to prevent disease transmission, statements by the CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council that masks do prevent disease transmission are in violation of the FDA EUA referenced in ¶104 and ¶105, 18 U.S.C. § 1035, 21 U.S.C. § 331, and the Food, Drug, and Cosmetic Act.

575.    Further, the billion dollar mask industry has never had to promote its devices as being capable of preventing the transmission of disease because the CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council is doing it for them.

116

576.    The mask apparel industry has not had to finance or conduct any trials to determine if their product is safe or effective.

577.    The CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council recommendations, mandates, policies, and orders circumvent 18 U.S.C. § 1035, 21 U.S.C. § 331, the Food, Drug, and Cosmetic Act and the FDA EUA referenced in ¶104 and ¶105.

578.    Plaintiff is an interested party seeking declaration of her rights under the United States Constitution as mask recommendations and mandates have functioned to deprive Plaintiff of her fundamental rights and caused injuries and damages.

579.    In addition to the declaratory judgments sought herein, Plaintiff seeks further necessary or proper prospective relief as justice may require.

## COUNT IX: REQUEST FOR INJUNCTIVE RELIEF

580.    Plaintiff incorporate all foregoing paragraphs, as if alleged herein in full.

581.    Plaintiff seeks a permanent injunction preventing the CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council from mandating cloth or non-medical masks or facial coverings which violate Plaintiff' rights under the United States Constitution and Federal Laws until such time as the FDA recognizes these items as medical devices, requires them to be subject to complete approval processes after undergoing testing for safety and effectiveness, and begins regulating them.

582.    Plaintiff seeks a permanent injunction preventing the CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council from recommending cloth or non-medical masks or facial coverings for the prevention of disease unless they include the cautions and warnings required by 21 CFR § 812.5 until such time as the FDA has fully approved them.

583.    Plaintiff seeks a permanent injunction preventing the CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council from running ads or publishing promotional materials or making public statements and other similar material that imply people who do not wear masks are rebellious, rejecting authority, uncaring, unloving, or any other negative term that may incite others to take negative actions against medically disabled persons.

584.    Plaintiff seeks a permanent injunction preventing Defendants from enacting policies and practices that discriminate against medically disabled and encourage or mandate that they wear devices against the advice of their doctors.

585.    In the absence of the issuance of injunctive relief, Defendants will cause, and continue to cause, immediate and irreparable harm to Plaintiff including, but not limited to, loss of her First, Fourth, Fifth, and Fourteenth Amendment freedoms and losses to health due to the added stress and abuse put upon her from public ostracism and denial of business services.

586.    Public policy favors the entry of a permanent injunction because such relief will prevent unlawful conduct and will preserve and protect Plaintiff's respective health interests.

587.    The harm to the Plaintiff and similarly situated people who are subjected to Defendants' discriminatory and unconstitutional recommendations and mandates of mask apparel herein substantially outweighs any harm to the Defendants.

588.    Plaintiff also seek preliminary and permanent injunctions premised on the basis asserted herein.

## COUNT X: REQUEST FOR HARASSMENT ORDER AGAINST THE DEFENDANTS

589.    Plaintiff incorporate all foregoing paragraphs, as if alleged herein in full.

590.    Plaintiff seeks a harassment order preventing t the CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council from public statements that those who do not wear masks are not good citizens, including but not limited to statements implying people who do not wear masks do not respect authority, do not care about others, do not base their decisions on science, etc. These statements harass Plaintiff and those similarly situated every time they are seen, and they encourage others to harass Plaintiff.

591.    Plaintiff seeks a harassment order preventing the CDC, Dr. Anthony S. Fauci, Governor Eric J. Holcomb, Dr. Kristina M. Box, the Marion City-County Council, Marion County Health Department, the St. Joseph County Council, the St. Joseph County Health Department, the Elkhart County Health Department, and the Elkhart County Council public statements that those who do not wear masks are spreading disease unless they conduct large direct evidence randomized controlled trials that show people who do not wear masks do spread disease.

592. Plaintiff seeks a harassment order preventing the Business Defendants from stopping her at the door of their establishments and preventing her entry into them solely because she is not wearing mask apparel.

593. In the absence of the issuance of a harassment order barring Defendants from making such statements and performing such actions, Defendants will cause, and continue to cause, immediate and irreparable emotional and psychological harm to Plaintiff and losses to health due to the added stress put upon them from public ostracism and denial of business services.

594. In the absence of the issuance of a harassment order barring Defendants from making such statements, Defendants could encourage others to commit acts of violence against Plaintiff and those similarly situated, either intentionally or unintentionally.

595. The harm to the Plaintiff and similarly situated people who are subjected to Defendants' discriminatory statements herein substantially outweighs any harm to the Defendants.

596. Plaintiff seeks preliminary and permanent injunctions premised on the basis asserted herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully request that this Court enter judgment against Defendants jointly and severally as follows:

A. Declare that Defendants' actions as set forth herein were in violation of Federal Law deprived Plaintiff of her rights, immunities, and privileges afforded thereunder;

B. Declare that Defendants' actions as set forth herein were in violation of the United States Constitution and deprived Plaintiff of her rights, immunities, and privileges afforded thereunder;

C. Declare Injunctive Relief restraining and prohibiting Defendants from mandating people wear non-medical masks which violates Plaintiff's rights under the United States Constitution and Indiana Law;

D. An order permanently enjoining Defendants from enforcing or encouraging mask apparel policies or practices against individuals who cannot wear mask apparel because of an ADA-covered disability.

D. Award Plaintiff her actual costs, including but not limited to reasonable court, service, and copying costs, and the following damages: Beacon --$75,000 for violating the ADA and for discriminatory policies that caused psychological and emotional harm to Plaintiff; Menard, Inc.,--$50,000 for violating the ADA and for discriminatory policies that caused psychological and emotional harm to Plaintiff; AMC Theaters--$25,000 for violating the ADA and for discriminatory policies that caused psychological and emotional harm to Plaintiff; Krispy Kreme--$25,000 for violating the ADA and for discriminatory policies that caused psychological and emotional harm to Plaintiff; Sephora--$25,000 for violating the ADA and for discriminatory policies that caused psychological and emotional harm to Plaintiff.

E. Any and all other relief just and proper in the premises.

## REQUEST FOR TRIAL BY JURY

COMES NOW Plaintiff, pro se, and request a trial by jury of all issues in this cause of action.

Respectfully submitted,

Jennifer Reinoehl

Pro se Litigant

Jennifer Reinoehl                     August 18, 2021
51860 Cheryl Dr.
Granger, IN, 46530
574-302-6088
E-Mail: commercialsonly@juno.com
Pro se Litigant

122

## **Verification**

I, Jennifer J. Reinoehl, declare as follows:

1. I am a Plaintiff in the present case, a citizen of the United States of America, and a resident of the State of Indiana.

2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint for Declaratory and Injunctive Relief; and if called on to testify I would competently testify as to the matters stated herein.

4. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct. 28 USC § 1746.

Executed on ___August 18___, 2021.

Jennifer Reinoehl